UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
|                ) | |
|         Plaintiff,      ) | |
|                ) | No.  4:11 CR 447 AGF (FRB) |
| v.                ) | |
|                ) | |
| SANDRA KAY BRYANT, et al.,      ) | |
|                ) | |
|         Defendants.      ) | |

## UNITED STATES OF AMERICA'S
## MEMORANDUM IN OPPOSITION TO
## DEFENDANT SANDRA KAY BRYANT'S
## <u>MOTION TO SUPPRESS STATEMENTS</u>

The United States of America states as follows in opposition to defendant Sandra Kay

Bryant's ("Ms. Kemper" [1]) Motion to Suppress Statements (Doc. # 44):

## <u>INTRODUCTION</u>

Ms. Kemper's claims of coercion and/or failure by law enforcement officers to advise her

of her rights are meritless.  Simply stated, Ms. Kemper cooperated with investigators during

their open, on-going investigation and admitted to her role in setting the fire that killed her 15-

year old son.  All statements obtained from Ms. Kemper in this case were lawfully obtained by

the investigating officers.  Accordingly, Ms. Kemper's motion to suppress statements should be

denied in its entirety.

---

[1]       Although presently known as Sandra Kay "Bryant," at all times relevant to these
incidents, defendant's name was "Sandra Kay Kemper."  For purposes of clarity regarding prior
statements made by her, the United States will refer herein to defendant as "Sandra Kemper" or
"Ms. Kemper."

<u>**EVIDENCE RELEVANT TO SUPRESSION ISSUE**</u> [2]

## I.   THE NOVEMBER 16, 2001, FIRE AT 6682 CHAMPANA LANE.

Detective Melissa Webb [3] was assigned to the Saint Louis County Police Department's Division of Criminal Investigation and had been a Saint Louis County Police Officer for approximately seven years when she responded to the scene of a fatal house fire at 6682 Champana in the early morning hours of November 16, 2001 (3/14/2003 Webb Tr. 43:3-6; 43:17-44:6, 14-16). [4] Fifteen year old Zachary Kemper, the son of Steven and Sandra Kemper, died in the fire. Once on the scene, Det. Webb made contact with Ms. Kemper and interviewed her for approximately 25 minutes on November 16, 2001, regarding the fire (3/14/2003 Webb Tr. 45:13-15; 46:4-6; 47:10-12; 49:11-20). Although the cause of the fire was undetermined on that date, the Saint Louis County Police Department continued to investigate.

During the course of that on-going investigation during the time period of November 17, 2001, to March 20, 2002, detectives learned that Steven Kemper, Sandra Kemper, and Sandra Kemper's mother, Betty Bryant, had been directly involved in three prior residential fires (September 12, 1996; January 1, 1997; July 20, 1999) which resulted in payouts to them from respective insurance companies. These three fires were in addition to the November 16, 2001, incident that killed Zachary Kemper. (No contact had been made or subsequent interviews undertaken with the Kempers since November 16, 2001.)

---

[2]     As always, this memorandum is not offered as a comprehensive statement of the Unites States' case. It is not intended to be in the nature of a Bill of Particulars that would fix and/or bind the United States to a set theory of proof. Instead, the purpose of this memorandum is to provide the Court with an outline of some of the United States' evidence relevant to Ms. Kemper's particular motion.

[3]     Detective Melissa Webb's maiden name was "Varga." Any reference to "Varga" has been substituted with "Webb" where practicable for clarity purposes.

[4]     The citations contained herein relate to the evidence and transcripts contained in the United States' "Appendix" filed separately with the Court.

## II.   MS. KEMPER'S MARCH 21, 2002, STATEMENTS ADMITTING TO SETTING THE FIRE.

On March 21, 2002, Detective Sergeant Michael McFarland (now deceased) was a 15-year veteran of the Saint Louis County Police Department, having been promoted to the rank of sergeant in 1998 and, as of 2002, the supervisor of the Saint Louis County Police Department's Bureau of Crimes Against Persons (3/14/2003 McFarland Tr. 9:19-25; 9/16/2005 McFarland Tr. 890:10-891:16).   Among other things, the Crimes Against Persons Bureau was responsible for investigating homicides (3/14/2003 McFarland Tr. 10:1-3; 9/16/2005 McFarland Tr. 891:17-20).

As part of the on-going investigation into the November 16, 2001, residential fire that killed Zachary Kemper, McFarland and other detectives, including Det. Webb, made contact with Sandra Kemper, Steven Kemper, Jay Long, and Betty Bryant at their new residence located at 5 Blossomwood Court in Saint Louis County, Missouri, on March 21, 2002 (3/14/2003 McFarland Tr. 10:4-12:3; 9/16/2005 McFarland Tr. 892:2-13; 3/14/2003 Webb Tr. 50:5-11). McFarland and other detectives made contact with the Kempers sometime between 10:15 a.m. and 10:45 a.m. on March 21, 2002 (9/16/2005 McFarland Tr. 892:14-15; 9/16/2005 Webb Tr. 925:17-926:6).   Sandra Kemper, Steven Kemper and Jay Long were asked to travel with the officers to the Saint Louis County Police Department's Office of Criminal Investigation to be interviewed (3/14/2003 McFarland Tr. 12:4-13; 9/16/2005 McFarland Tr. 892:16-893:8; 3/14/2003 Webb Tr. 51:16-21; 52:21-24; 9/16/2005 Webb Tr. 926:16-24; 927:7-11).   Each agreed (Id.).

The officers were not there with the intent of charging Ms. Kemper with a crime (9/16/2005 Webb Tr. 970:8-14).  Sandra Kemper, Steven Kemper and Jay Long were not under arrest at the time they left the 5 Blossomwood address (3/14/2003 McFarland Tr. 13:7-9; 9/16/2005 McFarland Tr. 893:25-894:2).   No one was in custody (3/14/2003 McFarland Tr. 13:10-11).  Each was free to say that they did not want to go (3/14/2003 McFarland Tr. 13:16-18;

9/16/2005 McFarland Tr. 894:2-4).  No one -- including Sandra Kemper specifically -- indicated that they were unwilling to travel with the officers or be interviewed (3/14/2003 McFarland Tr. 13:19-14:6; 9/16/2005 McFarland Tr. 894:5-6).  Ms. Kemper did not indicate that she wanted to speak with an attorney or anyone else prior to leaving her residence (3/14/2003 McFarland Tr. 14:10-12; 9/16/2005 McFarland Tr. 893:9-16).

Det. Webb transported Ms. Kemper from the Blossomwood residence to the police station (3/14/2003 Webb Tr. 52:1-3; 9/16/2005 Webb Tr. 927:11-12).  During transport, Ms. Kemper never indicated that she did not want to go and never requested a lawyer (3/14/2003 Webb Tr. 52:3-7; 9/16/2005 Webb Tr. 927:15-18).  Ms. Kemper was not under arrest, was not placed in handcuffs, and was not forcibly placed inside Det. Webb's vehicle (12/16/2002 Webb Tr. 53:12-14; 3/14/2003 Webb Tr. 52:10-16).  Ms. Kemper was placed in the front passenger seat of the vehicle (3/14/2003 Webb Tr. 53:5-12).  No questioning regarding the November 16, 2001, fire occurred during the drive from Blossomwood to the Office of Criminal Investigation (3/14/2003 Webb Tr. 53:18-20).

### A.      March 21, 2002, at approximately 2:20 p.m.: Ms. Kemper's First Voluntary Waiver of Rights.

Ms. Kemper was placed in an interview room after arriving at the Office of Criminal Investigation (3/14/2003 Webb Tr. 53:22-24; 9/16/2005 Webb Tr. 928:11-15).  The room measured approximately six feet by four feet furnished with a table and three chairs (3/14/2003 Webb Tr. 53:25-54:3).  Detective Matthew O'Neill accompanied Det. Webb inside the interview room with Ms. Kemper (3/14/2003 Webb Tr. 54:7-11; 9/16/2005 Webb Tr. 928:16-17).  Ms. Kemper was not handcuffed inside the interview room (3/14/2003 Webb Tr. 54:4-6; 56:24-25).  She was free to leave at any time (3/14/2003 Webb Tr. 57:1-2).  The police had not focused their investigation on her at that time and were not attempting to elicit statements to be used against Ms. Kemper (3/14/2003 Webb Tr. 84:3-10).  At that point, the police did not believe she was involved in the November 16, 2001, fire (12/16/2002 Webb Tr. 63:15-19; 3/17/2003 Webb Tr.

4:1-24; 6:25-7:18; 3/14/2003 McFarland Tr. 38:7-12). Accordingly, Ms. Kemper was not advised of her constitutional rights at the time the interview began (3/14/2003 McFarland Tr. 37:15-22; 3/17/2003 Webb Tr. 11:9-14).

Ms. Kemper was interviewed (3/14/2003 Webb Tr. 54:15-55:7; 3/14/2003 McFarland Tr. 14:19-15:11; 9/16/2005 McFarland Tr. 895:1-8). Det. Webb and Det. O'Neill asked Ms. Kemper about the November 16, 2001, fire and the other fires experienced by her and her family (3/14/2003 Webb Tr. 54:15-55:7; 9/16/2005 Webb Tr. 928:20-935:20). Ms. Kemper was also asked if Steven Kemper had started any of the fires (3/14/2003 Webb Tr. 55:8-11; 9/16/2005 Webb Tr. 934:23-935:20). The question upset Ms. Kemper (3/14/2003 Webb Tr. 55:12-13; 9/16/2005 Webb Tr. 934:23-935:20). Ms. Kemper asked to take a polygraph in response to the question (3/14/2003 Webb Tr. 55:12-15). Between the time of her arrival at the police station and request to take a polygraph, Ms. Kemper did not ask for an attorney, indicate that she no longer wanted to talk, or request to speak with anyone else (3/14/2003 Webb Tr. 56:11-23). Ms. Kemper was offered the use of the bathroom and asked whether she wanted soda or cigarettes (9/16/2005 Webb Tr. 936:5-19). Ms. Kemper was provided soda and cigarettes (Id.; 12/16/2002 Webb Tr. 66:17-20).

Det. Webb informed her supervisor, Sgt. McFarland, of Ms. Kemper's request and made arrangements with Detective Kenneth Schunzel who would be administering the polygraph examination (3/14/2003 Webb Tr. 57:4:19). Sgt. McFarland was able to observe the interview through closed circuit television inside the police station (3/14/2003 McFarland Tr. 16:5-8; 9/16/2005 McFarland Tr. 895:12-15). As the interview with Ms. Kemper progressed, she was asked about Steven Kemper and Steven Kemper's potential direct involvement in the November 16, 2001, fire (3/14/2003 McFarland Tr. 17:8-18:1; 9/16/2005 McFarland Tr. 898:23-899:7). Ms. Kemper became agitated by the questioning (Id.). Ms. Kemper -- on her own -- stated that she would be willing to take a polygraph examination (Id.) In light of Ms. Kemper's observed

agitation and request for a polygraph examination, Sgt. McFarland entered the interview room (Id.; 9/16/2005 McFarland Tr. 898:16-22; 3/14/2003 Webb Tr. 57:20-25).

Sgt. McFarland asked Ms. Kemper if she needed anything, needed to use the restroom, or if she would like anything to drink (3/14/2003 McFarland Tr. 18:2-8; 9/16/2005 McFarland Tr. 898:20-22; 9/16/2005 Webb Tr. 936:5-19).  Sgt. McFarland also explained to Ms. Kemper that, before a polygraph examination could be conducted, Ms. Kemper would be required to be advised of her constitutional rights (Id.).  During the course of her discussions with Sgt. McFarland, Ms. Kemper expressed a concern that she would need to contact her employer (3/14/2003 McFarland Tr. 18:9-18; 9/16/2005 McFarland Tr. 904:2-11).  Sgt. McFarland offered to contact her employer for her (Id.).  Ms. Kemper agreed and provided Sgt. McFarland with the telephone number (Id.).  Sgt. McFarland left the room and called Ms. Kemper's work on her behalf (Id.).

Sgt. McFarland returned to the room after making the call (3/14/2003 McFarland Tr. 18:19-22).  At some point he gave Ms. Kemper a soda (Id.; 9/16/2005 McFarland Tr. 904:2-7, 12-13).  Sgt. McFarland presented her with a warning and waiver form (Id.).  Sgt. McFarland took a Saint Louis County Police Department-issued written form and showed it to Ms. Kemper (3/14/2003 McFarland Tr. 18:23-19:2; 9/16/2005 McFarland Tr. 900:3-13).  Sgt. McFarland read the form together with Ms. Kemper (Id.).  Ms. Kemper initialed the form where required and signed it at approximately 2:20 p.m. on March 21, 2002 (3/14/2003 McFarland Tr. 18:19-23:16; 9/16/2005 Webb Tr. 937:2-15).   More specifically, Sgt. McFarland read the first line of the form to Ms. Kemper, which said: "Before we ask you any questions, you must understand what your rights are" (3/14/2003 McFarland Tr. 20:7-15; 9/-16/2005 McFarland Tr. 900:14-901:7).  Sgt. McFarland read the form's next line: "You do not have to make any statements at this time and have a right to remain silent" (3/14/2003 McFarland Tr. 20:16-19; 9/16/2005 McFarland Tr. 900:14-901:7).  Sgt. McFarland asked Ms. Kemper if she understood those first

two statements (3/14/2003 McFarland Tr. 20:18-24; 9/16/2005 McFarland Tr. 900:14-901:7). Ms. Kemper indicated that she understood and initialed where required on the form (Id.).

Sgt. McFarland continued to go through the form, telling Ms. Kemper that "Anything you say can and will be used against you in a Court of law" (3/14/2003 McFarland Tr. 20:25-21:2; 9/16/2005 McFarland Tr. 901:8-16). Ms. Kemper was asked by Sgt. McFarland if she understood that right (3/14/2003 McFarland Tr. 21:3-9; 9/16/2005 McFarland Tr. 901:8-16). Ms. Kemper understood and, again, initialed the form (Id.). Sgt. McFarland read the third section of the form aloud: "You are entitled to consult with an attorney before an interview and to have an attorney present at the time of the interview" (3/14/2003 McFarland Tr. 21:10-14; 9/16/2005 McFarland Tr. 901:17-25). Ms. Kemper understood the right and initialed the form where required (3/14/2003 McFarland Tr. 21:15-19; 9/16/2005 McFarland Tr. 901:17-25). The fourth section read to Ms. Kemper by Sgt. McFarland stated: "If you cannot afford an attorney, one will be appointed for you" (3/14/2003 McFarland Tr. 22:2-5; 9/16/2005 McFarland Tr. 902:1-5). Sgt. McFarland asked and Ms. Kemper stated that she understood that right by initialing the form (3/14/2003 McFarland Tr. 22:6-11; 9/16/2005 McFarland Tr. 902:1-5). Sgt. McFarland read the final section to Ms. Kemper:

> I have read the above statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me (3/14/2003 McFarland Tr. 22:12-19; 9/16/2005 McFarland Tr. 902:6-903:7).

Ms. Kemper was asked if she understood that final paragraph (3/14/2003 McFarland Tr. 22:20-23; 9/16/2005 McFarland Tr. 902:6-903:7). Ms. Kemper said she did (Id.). Ms. Kemper specifically signed her name to the form above "signature of suspect," and she wrote in the date and time (3/14/2003 McFarland Tr. 22:24-23:8; 9/16/2005 McFarland Tr. 902:6-903:7). Sgt. McFarland watched Ms. Kemper execute the form (3/14/2003 McFarland Tr. 23:2-3;

9/16/2005 McFarland Tr. 902:6-903:7). Sgt. McFarland then executed the form as well and left the room while the polygraph examination was being prepared (3/14/2003 McFarland Tr. 23:9-20; 9/16/2005 McFarland Tr. 904:8-22). A true and accurate copy of the warning and waiver form presented to Ms. Kemper by Sgt. McFarland and executed by Ms. Kemper is attached hereto as <u>Exhibit EH-1</u> and incorporated herein by this reference (<u>see also</u> 3/14/2003 McFarland Tr. 19:3-21; 25:14-20; 9/16/2005 McFarland Tr. 899:8-20). The warning and waiver form was provided to Det. Webb following Ms. Kemper's execution of it (3/14/2003 Webb Tr. 58:3-59:10).

During Sgt. McFarland's observation of and interaction with Ms. Kemper, she never indicated that she wanted to speak with a lawyer (3/14/2003 McFarland Tr. 23:23-24:1; 24:16-20). Ms. Kemper never requested to speak with anyone else -- other than making contact with her employer, which Sgt. McFarland did on Ms. Kemper's behalf (3/14/2003 McFarland Tr. 24:2-7; 24:24-25:1). She never stated she wanted to leave (9/16/2005 McFarland Tr. 905:11-14). Ms. Kemper was being cooperative (9/16/2005 McFarland Tr. 905:14-16). No threats or promises were made (3/14/2003 McFarland Tr. 24:8-10; 9/16/2005 McFarland Tr. 904:23-25). Ms. Kemper was allowed to use the restroom (3/14/2003 McFarland Tr. 25:2-4; 33:1-4; 9/16/2005 McFarland Tr. 905:1-7). She was not denied food or cigarettes (3/14/2003 McFarland Tr. 25:23-25; 26:4-6; 9/16/2005 McFarland Tr. 904:8-10), and she was provided at least one soda (3/14/2003 McFarland Tr. 26:1-3; 9/16/2005 McFarland Tr. 904:2-7, 12-13). Ms. Kemper was asked if she wanted anything to eat (3/17/2003 Webb Tr. 12:13-14). Sgt. McFarland was unarmed during his interactions with Ms. Kemper (3/14/2003 McFarland Tr. 25:5-6; 9/16/2005 McFarland Tr. 904:17-18).

**B.    March 21, 2002, at approximately 3:00 p.m.:
       Ms. Kemper's Second and Third Voluntary Waiver of Rights.**

At the time of his interaction with Ms. Kemper on March 21, 2002, Det. Kenneth Schunzel (now deceased) had been a Saint Louis County Police Department polygraph examiner for 20 years (5/15/2003 Schunzel Tr. 4:14-24). After receiving background information from Det. Webb, Det. Schunzel completed some paperwork and prepared for a polygraph examination of Ms. Kemper (5/15/2003 Schunzel Tr. 5:9-7:12). Sometime before 3:00 p.m., Det. Schunzel made contact with Ms. Kemper, introduced himself to her, and led Ms. Kemper into the polygraph examination room (5/15/2003 Schunzel Tr. 7:13-25; 8:18-20). During his initial interaction with Ms. Kemper, she never indicated that she did not want to take a polygraph examination or that she wanted to talk to a lawyer (5/15/2003 Schunzel Tr. 8:1-7). Ms. Kemper was not placed in handcuffs (5/15/2003 Schunzel Tr. 8:8-9). Once inside the polygraph examination room, Ms. Kemper was placed in a chair (5/15/2003 Schunzel Tr. 8:12-9:4). Det. Schunzel left the room briefly to activate the recording equipment in order to preserve the examination (Id.). Det. Schunzel's contact with Ms. Kemper lasted approximately two to three hours (5/15/2003 Schunzel Tr. 9:5-7).

Prior to interviewing Ms. Kemper, Det. Schunzel advised Ms. Kemper of her rights (5/15/2003 Schunzel Tr. 12:10-13). Before doing so, Det. Schunzel asked how Ms. Kemper was feeling (3/21/2002 Polygraph Tr. 2:1-4). Ms. Kemper said she was "fine, tired" (Id.). Det. Schunzel confirmed that Ms. Kemper knew that she was a possible suspect in the fire (3/21/2002 Polygraph Tr. 2:5-11). Ms. Kemper understood (Id.). Ms. Kemper was asked if she could read and write, to which she responded she could (5/15/2003 Schunzel Tr. 13:18-24; 3/21/2002 Polygraph Tr. 2:12-19).

Det. Schunzel presented a second written warning and waiver form to Ms. Kemper and requested that she read the form aloud, which Ms. Kemper did (5/15/2003 Schunzel Tr. 13:25-14:17:21; 3/21/2002 Polygraph Tr. 2:20-6:23). Specifically, Ms. Kemper read aloud that:

> Before we ask you any questions, you must understand what your rights are. Number one: You do not have to make any statement at this time and have a right to remain silent.
>
> Number two: Anything you say can and will be used against you in a court of law.
>
> Number three: You are entitled to consult with an attorney before any interview, and to have an attorney present at the time of interrogation.
>
> Number four: If you cannot afford an attorney, one will be appointed for you (5/15/2003 Schunzel Tr. 14:2-16:7; 3/21/2002 Polygraph Tr. 2:22-4:6).

After each paragraph read aloud by Ms. Kemper, she was asked by Det. Schunzel if she understood the paragraph read (Id.). Ms. Kemper stated she understood each and initialed after each paragraph (Id.).

Ms. Kemper was also asked to read the final paragraph on the form aloud which stated:

> I have read the above statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me (5/15/2003 Schunzel Tr. 16:14-22; 3/21/2002 Polygraph Tr. 4:10-23).

Det. Schunzel specifically asked if Ms. Kemper knew what "coercion" meant, explained it to her, and then asked Ms. Kemper if she understood the paragraph she just read (5/15/2003 Schunzel Tr. 16:23-17:8; 3/21/2002 Polygraph Tr. 4:24-5:9). Det. Schunzel also asked Ms. Kemper if she was "willing to waive your rights, give these rights up and talk to us about this particular incident" (5/15/2003 Schunzel Tr. 18:9-14; 3/21/2002 Polygraph Tr. 5:10-15). Ms. Kemper stated that she was (Id.). Ms. Kemper then signed and dated the warning and waiver form (5/15/2003 Schunzel Tr. 17:9-21, 18:15-17; 3/21/2002 Polygraph Tr. 5:16-23). A true and accurate copy of the warning and waiver form presented to Ms. Kemper by Det. Schunzel and

executed by Ms. Kemper is attached hereto as <u>Exhibit EH-2</u> and incorporated herein by this reference (<u>see</u> <u>also</u> 5/15/2003 Schunzel Tr. 12:10-18:7).

Ms. Kemper was next presented with the Saint Louis County Police Department Polygraph Examination Release. Ms. Kemper was asked to read the form to herself, which stated:

> I, SANDRA KEMPER, DO HEREBY AGREE VOLUNTARY (sic) WITHOUT DURESS, COERCION, PROMISE OF REWARD, IMMUNITY OR FORCE, TO BE EXAMINED THROUGH THE USE OF A POLYGRAPH INSTRUMENT... FURTHER, I WAS ADVISED THAT I COULD NOT BE FORCED OR COERCED INTO SUBMITTING TO THIS INTERVIEW AND/OR POLYGRAPH EXAMINATION AND UNDERSTAND THAT I MAY TERMINATE SAID INTERVIEW AND/OR POLYGRAPH EXAMINATION AT ANY TIME.
>
> I ACKNOWLEDGE THAT I HAVE EARLIER BEEN ADVISED OF MY CONSTITUTIONAL RIGHTS AS OUTLINED IN THE MIRANDA DECISIONS AND, AS I DID EARLIER, AGANIN KNOWINGLY AND VOLUNTARILY WAIVE MY RIGHTS... (5/15/2003 Schunzel Tr. 18:18-21:25; 3/21/2002 Polygraph Tr. 5:24-6:23)

Det. Schunzel also took time to explain these paragraphs to Ms. Kemper in greater detail:

> What that means is, Sandy, you are here of your own free will...If you don't want to take this polygraph test, you don't have to. Any time you want to get up and leave this room, you say, Mr. Schunzel, I'm sorry, I'm done, I'm finished, I don't want to talk to you anymore. You -- you can do that...You're here totally of your free -- of your own free will (5/15/2003 Schunzel Tr. 19:7-19; 3/21/2002 Polygraph Tr. 6:4-19).

Ms. Kemper repeatedly stated that she understood what was contained on the form and what Det. Schunzel was explaining to her (5/15/2003 Schunzel Tr. 19:2-19; 3/21/2002 Polygraph Tr. 6:2-19). As further confirmation of her understanding, Ms. Kemper and Det. Schunzel signed the release form (5/15/2003 Schunzel Tr. 19:20-21:25; 3/21/2002 Polygraph Tr. 6:20-23).

Having advised Ms. Kemper of her rights and obtained her signature on two separate forms, Det. Schunzel undertook his pre-polygraph interview, the polygraph examination, and

the post-polygraph interview. Three polygraph examinations were administered to Ms. Kemper, each lasting approximately five minutes long (5/15/2003 Schunzel Tr. 27:24-28:5; 38:8-13). At no time during her interaction with Det. Schunzel did Ms. Kemper state that she did not want to proceed or that she wanted to talk to a lawyer or anyone else (5/15/2003 Schunzel Tr. 25:21-26:4; 31:19-25). Det. Schunzel never made, nor was he aware of any other police officer making, any threats or promises to Ms. Kemper in order to get her to take the polygraph examination (5/15/2003 Schunzel Tr. 26:5-11; 32:1-5). Ms. Kemper's demeanor throughout was "calm, cool, collected," and she did not appear to be nervous (5/15/2003 Schunzel Tr. 26:12-27:3; 31:5-7; 44:5-45:3). Ms. Kemper never requested to use the bathroom or to be given food or drink throughout the exam, so none was provided or denied (5/15/2003 Schunzel Tr. 32:6-16). Ms. Kemper was told that she could terminate the interview at any time and never indicated a desire to do so (5/15/2003 Schunzel Tr. 32:17-22).

Following the polygraph examination, Det. Schunzel began the post-test interview and informed Ms. Kemper that she was deceptive during the examination (5/15/2003 Schunzel Tr. 37:20-38:7; 3/21/2002 Polygraph Tr. 117:11-155:9). During the course of the post-polygraph interview, among other things, Ms. Kemper admitted to her involvement in the November 16, 2001, residential fire at 6682 Champana which took the life of her 15-year old son, Zachary Kemper. During the course of her admission, Det. Schunzel asked Ms. Kemper about her prior experience with Det. Webb:

> SCHUNZEL: ...You get along with that female detective pretty good?
>
> KEMPER: Um-hum.
>
> SCHUNZEL: I went out and talked to her. She wants to sit down and talk to you. The only way she wants to talk to you is if you tell her the truth, as you told me. Will you do that for yourself?
>
> KEMPER: Um-hum.

SCHUNZEL:  Will you tell her the truth?

KEMPER:  Um-hum.

SCHUNZEL:  Tell her how you started the fire, and why you
started the fire?

KEMPER:  (Nods)...

SCHUNZEL:  Will you tell the detective everything that we talked
about?

KEMPER:  Um-hum.

SCHUNZEL:  The truth?

KEMPER:  Yes (3/21/2002 Polygraph Tr. 147:13-148:1;
148:11-15).

Ms. Kemper agreed to cooperate, speak with Det. Webb again, and tell Det. Webb the truth about what had happened (3/21/2002 Polygraph Tr. 153:25-155:9).

After the entire polygraph process was completed, Det. Schunzel went back to the third paragraph contained on Polygraph Examination Release, which stated:

WITH THE PRE-TEST INTERVIEW, EXAMINATION AND POST-TEST INTERVIEW NOW BEING OVER, I CERTIFY THAT I UNDERWENT ALL PROCEDURES VOLUNTARILY, WAS WELL TREATED AND REMAINED OF MY OWN FREE WILL AFTER HAVING BEEN ADVISED I COULD LEAVE AT ANYTIME (5/15/2003 Schunzel Tr. 22:1-23:6; 3/21/2002 Polygraph Tr. 154:13-16).

Ms. Kemper understood the paragraph, and she and Det. Schunzel signed underneath it indicating the same (Id.). A true and accurate copy of the Polygraph Examination Release presented to Ms. Kemper by Det. Schunzel and executed by Ms. Kemper is attached hereto as Exhibit EH-3 and incorporated herein by this reference (see also 5/15/2003 Schunzel Tr. 6:12-7:5; 23:7-18). A true and accurate copy of the video recording of the polygraph examination and

transcript of the recording are attached hereto as <u>Exhibit EH-4A</u> and <u>Exhibit EH-4B</u> and incorporated herein by this reference (<u>see</u> <u>also</u> 5/15/2003 Schunzel Tr. 9:8-11:23).

At the request of Det. Schunzel, Det. Webb entered the polygraph examination room, made contact with Ms. Kemper, and, as the two of them left the room, Det. Webb asked Ms. Kemper if she needed to use the restroom (3/21/2002 Polygraph Tr. 155:10-12). Ms. Kemper stated she did not (Id.).

### C.   March 21, 2002, at approximately 8:37 p.m.: Ms. Kemper's Fourth and Fifth Voluntary Waiver of Rights.

Det. Webb knew that Ms. Kemper had been previously advised of her rights at the time of her post-polygraph contact with Ms. Kemper because Sgt. McFarland had, earlier in the day and prior to the polygraph, provided Det. Webb with the written warning and waiver form executed by Ms. Kemper (3/14/2003 Webb Tr. 59:11-17). Det. Webb was informed by Det. Schunzel that Ms. Kemper had failed the polygraph examination and, among other things, admitted to setting the November 16, 2001, fire (3/14/2003 Webb Tr. 61:9-18). As a result, Det. Webb initiated a subsequent interview with Ms. Kemper (3/14/2003 Webb Tr. 62:19-23).

Det. Webb and Ms. Kemper returned to the interview room (3/14/2003 Webb Tr. 62:19-20). Det. O'Neill was present also (3/14/2003 Webb Tr. 64:5-6). Ms. Kemper was under arrest at that point and not free to leave (3/14/2003 Webb Tr. 64:24-65:2). But, Ms. Kemper was not in handcuffs (3/14/2003 Webb Tr. 64:15-17). Once inside the interview room, Ms. Kemper was verbally re-advised of her rights by Det. Webb (3/14/2003 Webb Tr. 63:2-4; 12/16/2002 Webb Tr. 77:2-78:22). Det. Webb did not utilize a written waiver form "because [Ms. Kemper] had already been Mirandized by Sergeant McFarland by the form" (3/14/2003 Webb Tr. 63:7-12; 9/16/2005 Webb Tr. 937:16-938:14). Det. Webb verbally told Ms. Kemper of her rights, including the right to remain silent and that anything could be used against her, the right to have an attorney present and, if Ms. Kemper could not afford one, an attorney would be appointed for her (3/14/2003 Webb Tr. 63:10-24). Det. Webb asked Ms. Kemper if she

understood those rights and wanted to continue with the interview (3/14/2003 Webb Tr. 64:25-65:1; 9/16/2005 Webb Tr. 938:11-14). Ms. Kemper understood and stated she wanted to continue (Id.). Ms. Kemper was then interviewed about her involvement in the November 16, 2001, fire (9/16/2005 Webb Tr. 938:15-950:20). Ms. Kemper never indicated that she did not want to talk with Det. Webb (3/14/2003 Webb Tr. 64:11-23). Ms. Kemper did not state that she wanted to talk to an attorney or anyone else (Id.; 9/16/2005 Webb Tr. 955:11-20).

After the interview, Det. Webb asked Ms. Kemper if she would make a recorded statement (3/14/2003 Webb Tr. 67:7-10; 9/16/2005 Webb Tr. 950:21-23). Ms. Kemper agreed and began making her recorded statement at approximately 8:37 p.m. (Exh. EH-5B at p. 1). The interview lasted until 8:50 p.m. (Exh. EH-5B at p. 16 ). At the outset of the interview, the following exchange occurred between Ms. Kemper and Det. Webb:

WEBB: For the purpose of the tape recording, would you acknowledge that you're aware the tape recording is being made?

KEMPER: Yes.

WEBB: Okay. Is it being made with your permission?

KEMPER: Yes.

WEBB: You signed the Warning and Waiver Form at approximately, uh, 2:20 p.m. on 03/21/02, and your rights were read to you. Did you understand your rights?

KEMPER: Yes.

WEBB: Are you still willing to continue with this interview?

KEMPER: Yes (Exh. EH-5B at p. 1).

Ms. Kemper went on to detail her involvement in setting the November 16, 2001, fire. A true and accurate copy of the audio recording and transcript of the recording are attached hereto as Exhibit EH-5A and Exhibit EH-5B and incorporated herein by this reference (see also

3/14/2003 Webb Tr. 67:22-68:1; 70:11-74:7; 9/16/2005 Webb Tr. 951:4-955:7). No threats, promises, or attempts to coerce Ms. Kemper into making her statement were ever made (9/16/2005 Webb Tr. 955:21-25). Ms. Kemper did not appear fatigued at the time of her recorded statement (12/16/2005 Webb Tr. 88:19-22).

Following the recorded statement, Det. Webb began the administrative procedure of booking Ms. Kemper for her crimes (3/14/2003 Webb Tr. 68:2-8; 12/16/2002 Webb Tr. 91:16-92:25). Det. Webb enlisted the assistance of Det. John Newsham to assist her with the administrative procedures (3/14/2003 Webb Tr. 68:9-15; 9/-16/2005 Webb Tr. 956:1-957:3). Det. Newsham was required to speak with Ms. Kemper as part of the administrative process (3/14/2003 Webb Tr. 68:16-18).

### D. March 21, 2002, at approximately 9:48 p.m.: Ms. Kemper's Sixth Voluntary Waiver of Rights.

Detective John Newsham was a 22-year veteran of the Saint Louis County Police Department on March 21, 2002, having spent the last four of those years as a detective with the Bureau of Crimes Against Persons (3/17/2003 Newsham Tr. 44:22-45:9). Det. Newsham had been monitoring much of the earlier interviews of Ms. Kemper through the police department's closed circuit television (3/17/2003 Newsham Tr. 46:21-47:9). During the interviews that Det. Newsham observed, Ms. Kemper never asked to speak to a lawyer or anybody else, never indicated that she did not wish to cooperate or speak with officers any more, and no threats or promises were made by any police officer to Ms. Kemper (3/17/2003 Newsham Tr.47:10-16; 48:4-10). Det. Newsham also was aware that Ms. Kemper had been advised of her rights earlier, having personally seen the executed warning and waiver form (3/17/2003 Newsham Tr. 46:12-20).

On March 21, 2002, Det. Newsham was asked by Det. Webb to handle the booking and processing of Ms. Kemper following Ms. Kemper's statements to detectives (3/17/2003 Newsham Tr. 45:15-21; 3/14/2003 Webb Tr. 68:9-15; 9/16/2005 Webb Tr. 957:1-3; 12/16/2002

Webb Tr. 91:16-92:25).  To do so, Det. Newsham entered the room where Ms. Kemper was located, filled out the booking form, and began to ask Ms. Kemper some questions (3/17/2003 Newsham Tr. 46:7-11; 3/14/2003 Webb Tr. 68:16-18).  Det. Newsham did not advise Ms. Kemper of her rights in light of Ms. Kemper's prior waiver and execution of the warning and waiver form (3/17/2003 Newsham Tr. 46:12-20).  Det. Newsham obtained basic personal information from Ms. Kemper to complete the booking sheet (3/17/2003 Newsham Tr. 48:22-49:1).  Det. Newsham also told Ms. Kemper that he wanted to ask her a couple of questions about the fire and Zachary Kemper's death (Id.).  Ms. Kemper never stated or otherwise indicated to Det. Newsham that she did not want to answer his questions (3/17/2003 Newsham Tr. 49:2-4).  Det. Newsham spoke with Ms. Kemper for approximately 15 minutes (3/17/2003 Newsham Tr.  49:5-7).  Based upon Ms. Kemper's statements to him, Det. Newsham left the room, contacted Sgt. McFarland and Det. Webb, and informed them that Ms. Kemper had further statements to make to the police officers (3/17/2003 Newsham Tr. 49:8-13; 9/16/2005 Webb Tr. 956:20-957:5; 12/16/2002 Webb Tr. 91:16-92:25).

Det. Newsham and Det. Webb returned to the room and met with Ms. Kemper again at approximately 9:48 p.m. (3/17/2003 Newsham Tr. 49:14-16; 9/16/2005 Webb Tr. 957:4-5; 12/16/2002 Webb Tr. 91:16-92:25; Exh. EH-6B at p. 1).  The interview lasted until 9:56 p.m. (Exh. EH-6B at p. 10).  At the outset of the interview, the following exchange occurred between Ms. Kemper and Det. Webb:

> WEBB:     Sandra, do you understand that this interview is being recorded on audio tape?
>
> KEMPER:   Yes.
>
> WEBB:     Is it being done so with your consent?
>
> KEMPER:   Yes.
>
> WEBB:     Before, I, or we ask you any questions, um, were you advised of your Constitutional Rights?

KEMPER: Yes (Exh. EH-6B at p. 1).

Ms. Kemper then made additional statements to Det. Newsham and Det. Webb (3/17/2003 Newsham Tr. 49:17-50:2; 3/14/2003 Webb Tr. 69:2-7; 9/16/2005 Webb Tr. 957:14-960:14). An audio recording of those statements was made (Id.; 9/16/2005 Webb Tr. 960:15-18). Sandra Kemper never objected to nor made any indication that she was unwilling to make the statements she made (3/17/2003 Newsham Tr. 50:3-5). Ms. Kemper did not indicate that she wanted a lawyer or to speak to anyone else (3/14/2003 Webb Tr. 69:8-10, 18-21). Ms. Kemper did not state the she no longer wanted to cooperate (3/14/2003 Webb Tr. 69:15-17). A true and accurate copy of the audio recording and transcript of the recording are attached hereto as Exhibit EH-6A and Exhibit EH-6B and incorporated herein by this reference (see also 3/14/2003 Webb Tr. 70:11-74:7; 9/16/2005 Webb Tr. 960:19-964:15).

## III. THE INDICTMENT.

On October 27, 2011, the federal grand jury returned a twenty-one page, 77-paragraph indictment charging Ms. Kemper with two crimes: during the time period of December 1996 through January 2002, aiding and abetting the use of fire to commit mail fraud (count one) and use of fire to commit mail fraud on November 16, 2001 (count two).

The indictment alleges, among other things, that Ms. Kemper and her then husband, Steven Kemper, began participating in a series of residential fires and the resulting fraudulent insurance pay-out process in December 1996 when the Saint Louis County residence of Betty Bryant was set ablaze by Steven Kemper on January 1, 1997. Steven and Sandra Kemper directly participated in obtaining and benefitting from the insurance proceeds from the fire.

Utilizing the knowledge and experience obtained from the January 1, 1997, fire, Steven and Sandra Kemper created a plan to set Betty Bryant's Alton, Illinois, residence on fire in order to obtain the insurance proceeds. On July 20, 1999, Sandra Kemper entered Betty Bryant's residence and started a fire inside. After the fire, Steven and Sandra Kemper directly participated in obtaining and benefitting from the insurance proceeds from the fire.

Again utilizing the knowledge and experience obtained from the January 1, 1997, and July 20, 1999, fires and the resulting insurance pay-out process, Steven and Sandra Kemper created a plan to set their own Saint Louis County residence at 6682 Champana Lane on fire in November 2001.  On November 16, 2001, Sandra Kemper started a fire in a trash can located a few feet away from where her son, Zachary Kemper was sleeping.  Sandra Kemper, Steven Kemper, Steven Kemper's lover, Jay Long, and Betty Bryant -- all of whom were inside the residence at the time the fire was set -- were able to escape the residence after the fire had begun.

Once the fire was extinguished, fire personnel located the lifeless body of Zachary Kemper on the basement floor adjacent to his bed.  Zachary Kemper lay on his chest with his arms covering his head and face.  A fire extinguisher was located on the basement floor, a few feet away from Zachary Kemper's body.  The subsequent examination by the Saint Louis County Medical Examiner's Office concluded that Zachary Kemper suffered from thermal burns of the trunk, lower extremities, head and upper extremities; soot in his airway; and the immediate cause of death was acute carbon monoxide intoxication based upon the presence of 75% carbon monoxide within his body.

Immediately following the fire, Steven and Sandra Kemper, along with Betty Bryant, began applying for and collecting money on the various homeowner's and life insurance policies that existed on the 6682 Champana Lane residence and Zachary Kemper's life.  Because of Steven and Sandra Kemper's direct involvement in the planning and setting of the fire, the indictment charges that the application for, pay-out, and receipt of these insurance funds were fraudulent and Ms. Kemper's use of fire on November 16, 2001, made these fraudulently-induced pay-outs possible.

*          *          *

Ms. Kemper now seeks to suppress all statements and other information provided by her to investigators on March 21, 2002, on all sorts of grounds, that is, she was never "clearly and

unequivocally" informed of her Miranda rights during the polygraph and her statements were coerced, provided without knowledge of her Fifth Amendment Rights, and/or illegally obtained. All of Ms. Kemper's actions throughout the investigation were voluntary and undertaken with the full knowledge of her legal rights.

As set forth above and discussed below, Sandra Kemper was repeatedly advised and re-advised of her constitutional rights (12/16/2002 Webb Tr. 102:9-20). Ms. Kemper always indicated that she understood her rights and wanted to participate in the on-going investigation (Id.).

## LEGAL ANALYSIS

**I.     MS. KEMPER'S STATEMENTS WERE VOLUNTARILY PROVIDED, PROPERLY OBTAINED, AND ARE ADMISSIBLE** [5]

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that, before questioning a person in custody, law enforcement officials must advise the person that he has

---

[5]     By this memorandum, the United States seeks to reserve its right to utilize all statements made by Ms. Kemper to law enforcement with one notable exception: Any statements made by Ms. Kemper to Det. Schunzel during the polygraph pre-test interview, actual examination, and post-test interview will not be offered into evidence against Ms. Kemper at trial. Furthermore, it is the position of the United States that any polygraph evidence, including the mere reference to a polygraph examination, is inadmissible. See United States v. Gill, 513 F.3d 836, 846 (8th Cir. 2008) (refusing to reopen the record to allow testimony regarding polygraph examinations); United States v. Gianakos, 415 F.3d 912, 925 (8th Cir. 2005) (upholding exclusion of witnesses' failed polygraph tests from evidence where witnesses and police officer could be cross-examined about witnesses' credibility); United States v. Swayze, 378 F.3d 834, 837 (8th Cir. 2004) (stating that juries, not polygraph tests, should determine credibility); Ortega v. United States, 270 F.3d 540, 548 (8th Cir. 2001) (rejecting use of court-proposed polygraph examination as ground for sentencing enhancement). Should Ms. Kemper attempt to introduce evidence regarding the polygraph at trial, the United States will more fully address the issue with the District Court.

However, the United States addresses the polygraph examination at this time for the limited purposes of this suppression motion *only* to the extent Ms. Kemper suggests that polygraph examination is evidence of the coercive nature of her contact with law enforcement. See, e.g., United States v. Suschanke, 2010 WL 2544941, *6 (E.D. Mo. May 27, 2010) (Buckles, J.); see also United States v. Kampiles, 609 F.3d 1233, 1244 (7th Cir. 1979) (when a confession is preceded by a failed polygraph examination and the confession is challenged as coerced, evidence that defendant was informed of the failure may be admitted to show the circumstances surrounding the confession and rebut the charge of coercion).

the right to remain silent; that any statements he makes may be used against him at trial; that he has the right to have an attorney present during questioning; and that if he cannot afford an attorney one will be appointed for him.  Id. at 478-79; see also Suschanke, 2010 WL 2544941 at *4.  A suspect is deemed "in custody" and entitled to Miranda warnings only when she has been formally arrested or when her freedom of action is curtailed to a degree associated with formal arrest.  United States v. Glaceran, 301 F.3d 927, 929 (8th Cir. 2002) (citing Berkemer v. McCarthy, 468 U.S. 420, 440 (1984)).  "Custodial interrogation" means questioning initiated by the law enforcement officer after the suspect has been taken into custody.  Illinois v. Perkins, 496 U.S. 292, 297 (1990).  If, after being given Miranda warnings, a defendant agrees to make a statement in response to questioning, the United States must show that the waiver was voluntary, knowing, and intelligent for the statement to be admissible at trial.  Miranda, 384 U.S. at 479; Colorado v. Connelly, 479 U.S. 157, 169-70 (1986); North Carolina v. Butler, 441 U.S. 369, 375-76 (1979).

> **A.  Ms. Kemper was repeatedly, completely, and accurately advised of her Miranda rights.**
>
> **1.  The Miranda warnings were given.**

The advice of rights given to Ms. Kemper complied in all respects with the requirements of Miranda.  Miranda requires that prior to any questioning in a custodial setting, the suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Miranda, 384 U.S. 436 at 444.  The purpose of the warning that anything the suspect says can be used against him in court is to ensure that the suspect is "aware of the privilege against self-incrimination, under[stands] the consequences of waiving this privilege, and recognize[s] the adversarial nature of the proceedings."  United States v. Johnson, 47 F.3d 272, 277 (8th Cir. 1995).  Miranda does not require a specific warning on the potential sentencing consequences of waiving the rights to remain silent or to be represented by counsel.

Id.; United States v. Peck, 161 F.3d 1171, 1174 (8th Cir. 1998) ("Lack of awareness of the potential adverse impact of statements is not sufficient in itself to invalidate a waiver of the right to counsel.").

The record is clear:  Ms. Kemper was advised of her Miranda rights on multiple occasions.  Sgt. McFarland went over the warning and waiver form with Ms. Kemper line-by-line.  Ms. Kemper initialed after each right as it was discussed.  Ms. Kemper then signed and dated the document.  The same occurred with Det. Schunzel.  He went over the warning and waiver form *and* the polygraph consent form with Ms. Kemper line-by-line.  She was required to read the warning and waiver form out loud.  Det. Schunzel provided greater explanation as to what "coercion" meant.

The advice of rights forms show that Ms. Kemper was advised that she had the right to remain silent, that anything she said could be used against her in court, that she had the right to seek the advice of a lawyer before she answered any questions, that she had the right to have a lawyer with her during questioning, and that a lawyer would be appointed for her if she could not afford one.  The form also set forth that:

> I have read the above statement of my rights and I understand what my rights are.  I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me (Exh. EH-1; Exh. EH-2).

The advice of rights forms shown to Ms. Kemper encompassed all of the warnings required by Miranda.

Ms. Kemper also was advised that she had the right to refuse to take the polygraph exam, that she had the right to stop the polygraph exam at any time, and that she had the right to refuse to answer any individual question during the polygraph exam. Although the polygraph consent form did not reiterate Ms. Kemper's right to consult with a lawyer and to have a lawyer present during the polygraph exam, the general advisement of rights, provided to Ms. Kemper at

the same time as the polygraph consent form, adequately informed Ms. Kemper that she had a right to consult a lawyer before answering any questions and to have a lawyer present during the upcoming questioning.  See United States v. Anaya, 715 F.Supp.2d 916, 931-937 (S.D. 2010).

Following the polygraph post-test interview, Det. Webb verbally re-advised Ms. Kemper of her Miranda rights.  At the outset of both recorded statements made by Ms. Kemper, Det. Webb again reminded Ms. Kemper of the rights she had previously acknowledged and waived. There is nothing improper about reminding a defendant about previously provided rights (as opposed to re-stating the rights in their entirety).  See United States v. Gerding, 2007 WL 2462682, *11-12 (E.D. Mo. Aug. 28, 2007) (Mummert, J.) (admitting statement made by defendant after being advised of his Miranda rights three times in a four-hour period and making statement approximately thirteen hours later, after being asked if he remembered those rights to which defendant replied that he did).

Of course, there was no requirement that Det. Schunzel or Det. Webb re-advise Ms. Kemper following the actual polygraph exam -- but Det. Webb did so anyway after Ms. Kemper agreed to speak with Det. Webb about what Ms. Kemper had told Det. Schunzel during the polygraph process.  After a warned polygraph exam, there is no per se requirement for Miranda warnings before post-exam questioning.  United States v. Black Bear, 422 F.3d 658, 664 (8th Cir. 2005) (citing Wyrick v. Fields, 459 U.S. 42, 48-49, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982); McDowell v. Leapley, 984 F.2d 232, 234 (8th Cir. 1993); Vassar v. Solem, 763 F.2d 975, 978 (8th Cir. 1985); United States v. Eagle Elk, 711 F.2d 80, 83 (8th Cir. 1983)); see also United States v. Dupris, 422 F.Supp.2d 1061, 1071-72 (S. S.D. 2006) (inculpatory statements admissible where defendant agreed to and completed polygraph examination, executed consent and waiver forms, was informed his responses were deceptive, and continued to answer questions without an additional advisement of constitutional rights.)

Furthermore, the fact that Ms. Kemper was advised and interviewed by differing individuals is also of no moment.  The change in interrogator between the polygraph and post-

polygraph questioning is not itself decisive, particularly where the subsequent interrogator arranged the polygraph examination, as Det. Webb had done at Ms. Kemper's request. Black Bear, 422 F.3d at 664-65 (citing United States v. Gell-Iren, 146 F.3d 827, 830-31 (10th Cir. 1998); United States v. Andaverde, 64 F.3d 1305, 1312-13 (9th Cir. 1995)). The Eighth Circuit has held that "after a (warned) polygraph exam, there is no per se requirement for Miranda warnings before (admissible) post exam questioning." Black Bear, 422 F.3d at 664 (citations omitted). Indeed, it is well established that "[m]erely disconnecting the polygraph equipment" does not remove the knowledge of the rights explained to the defendant before the examination from the defendant's mind. See Vasser, 763 F.2d at 978. And the fact that, as here, a new interrogator is involved in the post-polygraph interview does not mean that the suspect is no longer making a knowing and intelligent relinquishment of his rights. See Black Bear, 422 F.3d at 664-65.

### 2.     The Miranda warnings were complete and accurate.

Moreover, complete and accurate Miranda warnings were given to Ms. Kemper. Nothing more was required to be told to her. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." Colorado v. Spring, 479 U.S. 564, 574 (1987). Thus, "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might ... affec[t] his decision to confess.'" Id. at 576 (quoting Moran v. Burbine, 475 U.S. 412, 422 (1986)). The Supreme Court has "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." Id. at 576-77 (internal quotation omitted). Where additional information would "affect only the wisdom of a Miranda waiver, not its essential voluntary and knowing nature," the waiver is not invalid. See Id. at 577.

For example, there is no requirement that Ms. Kemper be informed of the potential charges or penalties to which she could be subjected. The advisement that anything Ms. Kemper

said could be used against her in court was sufficient to advise her of the consequences of answering questions without a lawyer.  See Anaya, 715 F.Supp.2d at 931-937 (citing Peck, 161 F.3d at 1174; Johnson, 47 F.3d at 277; Spring, 479 U.S. at 575 (finding that waiver was knowing and intelligent even though defendant was not aware of all possible subjects of questioning in advance of interrogation)).  Ms. Kemper was completely and adequately advised of her Miranda rights by Sgt. McFarland once she requested that the polygraph be administered, by Det. Schunzel at the beginning of the polygraph session, by Det. Webb immediately following the polygraph session, by Det. Webb at the beginning of her first recorded statement, and again by Det. Webb at the beginning of her second recorded statement.

Ms. Kemper's suggestion that she was never adequately advised of her Miranda rights is patently false and belied by the substantial record on this issue.  She was clearly, completely, and accurately advised on multiple occasions.  Ms. Kemper understood her rights, waived them, and voluntarily answered questions posed to her by the detectives.  Ms. Kemper's challenge to the Miranda warnings given to her should be denied.

**B.      Ms. Kemper's statements were voluntary.**

Faced with the straightforward evidence that she was repeatedly advised of her Miranda rights, the crux of Ms. Kemper's argument appears to be that any statements made by her were involuntary.  Her motion fails in this regard as well.  See Frazier v. Cupp, 394 U.S. 731, 739 (1969) (advisement of constitutional rights when interview began was "quite relevant to a finding of voluntariness.").

Due process requires that confessions be voluntary.  See Brown v. Mississippi, 297 U.S. 278, 285-86 (1936); see also Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973) (explaining that voluntary confession may be used against defendant while the use of involuntary confession offends due process).  "The appropriate test for determining the voluntariness of a confession is 'whether ... pressures exerted upon the suspect have overborne his will.'"  United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990), cert. denied, 502 U.S.

829 (1991), (quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989)).  A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." Schneckloth, 412 U.S. at 225.  On the other hand, "[a] statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."  United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004); Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (citing Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).

The voluntariness of a confession is judged by the totality of the circumstances.  Id.  Two factors the court must consider are the "conduct of the officers and the characteristics of the accused."  Id; Meirovitz, 918 F.2d at 1379.  A statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity.  Connelly, 479 U.S. 157 at 164-167.  "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary."  LeBrun, 363 F.3d at 724.

### 1. The detectives' conduct.

First, the detectives presented Ms. Kemper with a written warning and waiver form on two separate occasions.  A written waiver itself, that a defendant signed, constitutes strong evidence that she had a clear understanding of her rights and intended to and did give up the same.  See Butler, 441 U.S. at 373 ("An express written ... statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of that waiver ....").  These waivers unequivocally demonstrate a voluntary, knowing, and intelligent waiver of these rights by Ms. Kemper.  Suschanke, 2010 WL 2544941 at *4 (citing United States v. Ingram, 839 F.2d 1327, 1329 (8th Cir. 1988)).

Second, the detectives did not extract Ms. Kemper's statements by threats, violence, or express or implied promises sufficient to overbear Ms. Kemper's will and critically impair her capacity for self-determination.  See LeBrun, 363 F.3d at 724.  "Obviously, interrogation of a

suspect will involve some pressure because its purpose is to elicit a confession." United States v. Astello, 241 F.3d 965, 967 (8th Cir.), cert. denied, 533 U.S. 962 (2001); Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004); United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002) (Effective interrogation often involves some degree of pressure as its purpose is to elicit a confession.); see also Battle v. Delo, 19 F.3d 1547, 1563 (8th Cir. 1994) (finding no coercive police activity when defendant confessed after being told by officer that he did not believe him); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (finding no coercive police activity when defendant was informed that her polygraph test results indicated deception).  However, there must be some showing that the officers engaged in some coercive conduct to overbear the will of the defendant.  Id. "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'."  Connelly, 479 U.S. at 167.

"[O]fficers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices.  None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation caused the defendant's will to be overborne." United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (internal citations and quotes omitted); see also United States v. Martin, 369 F.3d 1046, 1055 (8th Cir. 2004) ("a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne."); Jenner, 982 F.2d at 334 (A raised voice or sympathetic attitude on the part of the interrogator does not require a finding that a defendant's will was overborne.); Gerding, 2007 WL 2462682 at *11-12 (finding no coercive police tactics where officer raised his voice, told defendant his description of events was inconsistent with autopsy results, and asked defendant what defendant would say if officer told him someone had seen him hit his wife).

For example, although the questioning of Ms. Kemper was spearheaded by law enforcement, nothing about the detectives' tactics resulted in her free and unconstrained will being overborne. Nothing suggests that Ms. Kemper's statements were acquired by trick, promises, or threats, and that the use of the polygraph exam was but one facet of a concerted effort by the detectives to improperly coerce Ms. Kemper to make statements. The tone of the polygraph and subsequent interviews was calm and conversational. Ms. Kemper's demeanor throughout was calm and lacked significant external signs that she was nervous, anxious, or shaky. Ms. Kemper had been advised, re-advised, and reminded of her rights throughout the day. There is no indication of physical intimidation or threats; no promises by anyone. In light of these facts, nothing about the detectives' tactics rendered Ms. Kemper's statements involuntary.

Ms. Kemper appears to take issue with Det. Schunzel's statement that she failed the polygraph as well as the number of times she was questioned by the detectives. First, it was Det. Schunzel's professional and experienced opinion that Ms. Kemper did, in fact, fail the polygraph examination by answering deceptively to one or more questions asked of her. Therefore, Det. Schunzel's statement cannot be coercive because it was true. See Johnson v. Pollard, 559 F.3d 746, 753-55 (7th Cir. 2009) (Merely advising a defendant that he failed a polygraph does not amount to coercion.); see also Barrera v. Young, 794 F.2d 1264, 1266, 1270–71 (7th Cir. 1986) (concluding that the fact that a polygraph examiner accurately informed the petitioner about the results of his co-defendant's polygraph examination did not render the petitioner's confession involuntary); United States v. Wilson, 1994 WL 6042, *2-3 (6th Cir. 1994) (citing Bae v. Peters, 950 F.2d 469, 475 (7th Cir. 1991) (holding nothing coercive in truthfully informing defendant that she failed polygraph test).

Even if Det. Schunzel's statement was incorrect or false -- which it was not -- the use of "deception by an interrogator does not automatically invalidate a confession." Santos-Garcia, 313 F.3d at 1079 (Deception itself does not render a statement involuntary unless the overall

impact is that the will of the defendant is overborne.); <u>Sotelo v. Indiana State Prison</u>, 850 F.2d 1244, 1251 (7th Cir. 1988) (holding fact that the detective made false or misleading statement during the course of the interrogation does not, by itself, render confession involuntary); <u>United States v. Harris</u>, 914 F.2d 927, 933 (7th Cir. 1990) (holding fact that officer misrepresents strength of evidence against a defendant is insufficient, standing alone, to render an otherwise voluntary confession inadmissible); <u>Holland v. McGinnis</u>, 963 F.2d 1044, 1051 (7th Cir. 1992); <u>Clanton v. Cooper</u>, 129 F.3d 1147, 1158 (10th Cir.1997); <u>United States v. High Horse</u>, 2008 WL 2783197, *2 (D.S.D. 2008) (holding statement that defendant failed polygraph -- whether truthful or not -- is not a sufficient basis to satisfy the overborne-will element).

An interrogating officer's misrepresentations are neither dispositive of nor irrelevant to the question of whether a defendant's statement was voluntary. Rather, when an interrogator makes a false statement to a defendant, a court should evaluate the extent to which the misrepresentation "[overcame the defendant's] will by distorting an otherwise rational choice." <u>Holland</u>, 963 F.2d at 1051 (holding statement admissible even though false claim made that a witness had seen the defendant's vehicle at the crime scene); <u>see</u>, <u>e.g.</u>, <u>Frazier</u>, 394 U.S. at 739 (holding fact that police made false statement that the co-defendant had confessed, while relevant, was insufficient to make otherwise voluntary confession inadmissible); <u>Lucero v. Kerby</u>, 133 F.3d 1299, 1311 (10th Cir. 1998) (holding statement admissible despite misrepresentation regarding fingerprint evidence found in the victim's home); <u>Ledbetter v. Edwards</u>, 35 F.3d 1062, 1066, 1070 (6th Cir. 1994) (falsified fingerprint-comparison chart, claim that three witnesses had identified defendant, and staged victim identification were insufficient to find statement inadmissible); <u>United States v. Haswood</u>, 350 F.3d 1024, 1029 (9th Cir. 2003) (holding police misrepresentation that the defendant's polygraph results indicated deception did not involve coercive conduct).

Let the record be clear: Det. Schunzel did and said nothing wrong or inappropriate during his interaction with Ms. Kemper -- *an interaction that Ms. Kemper specifically*

*requested*.  Det. Schunzel's statements throughout his examination and interview of Ms. Kemper did not cause Ms. Kemper to "consider anything beyond [her] own beliefs regarding [her] actual guilt or innocence, [her] moral sense of right and wrong, and [her] judgment regarding the ... evidence linking [her] to the crime."  Holland, 963 F.2d at 1051.  Det. Schunzel's statements to Ms. Kemper about the potential ramifications of her failure to be truthful, "might have been uncomfortable for" Ms. Kemper, but they were "hardly coercive."  United States v. Richardson, 903 F.2d 844, (C.A.D.C. 1990) (citing United States v. Pelton, 835 F.2d 1067, 1072-73 (4th Cir. 1987)).

Third, the length of questioning did not illegally restrain Ms. Kemper's liberty either. Ms. Kemper interacted with law enforcement officials for over five hours (see Kemper Mot. ¶ 7). See Jenner, 982 F.2d at 334 (finding questioning for six or seven hours not per se coercive).  The length of time, taken in light of the facts as a whole, does not demonstrate that Ms. Kemper's will was overborne, particularly when she stated that she wanted to cooperate and tell the truth, and she was repeatedly advised, re-advised, and reminded of her rights.  Likewise, the fact that Ms. Kemper was questioned multiple times is of no moment, particularly because Ms. Kemper indicated her willingness to cooperate, her desire to speak with detectives and, as previously discussed, she was repeatedly was reminded of her Miranda rights.  See Evans v. Dowd, 932 F.2d 739, 742 (8th Cir.1991) (finding it difficult to conclude a confession was coerced after full Miranda warnings were given).  Also, numerous breaks occurred between questioning.  These breaks repeatedly gave Ms. Kemper time alone to consider what was occurring and her participation in the on-going investigation.  There was nothing coercive about these interactions as to compel Ms. Kemper to give an involuntary confession.

Fourth, the detectives never denied Ms. Kemper anything.  To the extent she asked for soda and cigarettes, she was given them.  There is no evidence that Ms. Kemper ever asked for a meal to be provided or that she was denied the opportunity for anything.  "All of these things

weigh in favor of a finding that the defendant's statements were voluntary and [her] will was not overborne." Suschanke, 2010 WL 2544941 at *6.

Fifth, no promises of leniency were made by detectives. In order to render a confession involuntary, a promise of leniency must rise to the level of an "irresistible inducement." United States v. Wrice, 954 F.2d 406, 411 (6th Cir.), cert. denied, 112 S.Ct. 2286 (1992); see also United States v. Pelton, 835 F.2d 1067, 1073 (4th Cir. 1987) ("general encouragement to cooperate is far different from specific promises of leniency"); United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir.1985) ("'truthful and noncoercive statement of the possible penalties which an accused faces,' may be given to the accused without leading to an involuntary statement") (quoting United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir.1978)). Assurances that an officer will advise the prosecutor or court of a defendant's cooperation do not render a statement involuntary. See, e.g., United States v. Walker, 272 F.3d 407, 412 (7th Cir. 2001). Telling a defendant that she will be better off if she cooperates, without more, does not render a confession involuntary. See Rupe v. Wood, 93 F.3d 1434, 1444 (9th Cir. 1996) (holding that a confession obtained after a polygraph examiner informed a defendant that he had failed a lie detector test and that he "would be better off if he cooperated" was not involuntary); United States v. Pinion, 800 F.2d 976, 980-81 (9th Cir. 1986) (holding that statements by police to defendant that it would be "better for him if he confessed" did not render the resulting confession involuntary).

### 2. Ms. Kemper's characteristics.

There was nothing about Ms. Kemper's appearance, demeanor, or mental faculties that suggested Ms. Kemper was unable to understand her rights. "There is no constitutional right for 'a criminal defendant to confess to his crime only when totally rational and properly motivated.'" Lyons v. Luebbers, 403 F.3d 585, 597 (8th Cir. 2005) (quoting Connelly, 479 U.S. 157 at 166) (alteration added).

For example, there was no evidence or other information available to investigators that Ms. Kemper was either intoxicated or under the influence of narcotics, such that Ms. Kemper was unable to understand her rights. Ms. Kemper agreed to cooperate with law enforcement. She indicated a willingness to proceed with questioning. There was nothing about Ms. Kemper's appearance, demeanor, or mental faculties that suggested Ms. Kemper was unable to understand her rights. To the contrary, Ms. Kemper was a middle-aged woman possessing at least a high school education and some higher education and training which permitted her to work in the healthcare field. She, historically, had been and on March 21, 2002, was gainfully employed. All of these facts suggest that Ms. Kemper was not particularly vulnerable to coercion. There is nothing in the record to indicate that Ms. Kemper could not exercise a rational intellect and free will while interacting with the police.

In fact, when asked how she was doing by Det. Schunzel, Ms. Kemper responded, "Fine. Tired." Ms. Kemper's claims that she was tired, fatigued, depressed, or otherwise also are insufficient. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Connelly, 479 U.S. at 522 (alteration added). "Although we believe that personal characteristics such as those on which (the defendant) relies would be relevant to the voluntariness issue once coercive police activity has been shown, Connelly makes it clear that such personal characteristics of the defendant are constitutionally irrelevant absent proof of coercion brought to bear on the defendant by the State." Sidebottom v. Delo, 46 F.3d 744, 758 (8th Cir. 1995) (interim quotations omitted); United States v. Rohrbach, 813 F.2d 142, 144 (8th Cir. 1987)(internal citations and quotes omitted). Indeed, Connelly suggests that law enforcement officers need not conduct testing to determine the physical and mental condition of a suspect in the absence of any indication of a present impairment.

Here, Ms. Kemper did not inform any detective of any condition, other than to say she was tired. In the absence of any indication that Ms. Kemper suffered from a physical or mental

impairment that affected her decision to continue answering questions, a conclusion cannot be reached that Ms. Kemper's statements were involuntary because the detectives did not perform any tests to determine her mental and physical condition. For example, "sleeplessness and fatigue do not automatically render a confession involuntary." United States v. Gaddy, 532 F.3d 783, 788 (8th Cir . 2008); see also United States v. Junkman, 160 F.3d 1191, 1194 (8th Cir. 1998) (rejecting defendant's claim that confession was coerced because he gave it after being awakened by police from a methamphetamine-induced sleep; officer had testified that defendant's eyes were red but did not appear intoxicated, inhibited, or disoriented, and defendant had stated to officer that he understood his Miranda rights); United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998) (finding waiver to be knowing and intelligent where defendant had low IQ and PCP intoxication because he was intelligent enough to understand his rights, was cooperative, initialed each admonition on the waiver form, and gave accurate information); United States v. Klein, 13 F.3d 1182, 1184 n. 2 (8th Cir. 1994) (rejecting defendant's claim that confession should be suppressed because he was severely intoxicated when there was no evidence of police coercion). "Emotionalism and confusion" alone are insufficient to render a confession involuntary. McCall v. Dutton, 863 F.2d 454, 460 (6th Cir. 1988), cert. denied, 490 U.S. 1020 (1989). This is particularly true here, where Ms. Kemper was intelligent, understood what was occurring, and knowingly signed and acknowledged the waiver on multiple occasions.

*       *       *

Looking at the totality of the circumstances, the United States has shown by a preponderance of the evidence that Ms. Kemper's statements on March 21, 2002, were the product of an essentially free and unconstrained choice by her.

**C.** **Ms. Kemper's waiver of her <u>Miranda</u> rights was voluntary, knowing, and intelligent.**

Ms. Kemper voluntarily, knowingly, and intelligently waived her <u>Miranda</u> rights. A criminal suspect may waive her constitutional rights protected by <u>Miranda</u>. But the waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and the suspect must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>United States v. Jones</u>, 23 F.3d 1307, 1313 (8th Cir. 1994). The "'totality of circumstances surrounding the interrogation'" guides the determination of whether a waiver was voluntary, knowing, and intelligent. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).

The determination of whether a waiver is voluntary for <u>Miranda</u> purposes is determined by the same standard used to determine whether a statement is voluntary for Fifth Amendment due process purposes. <u>United States v. Makes Room for Them</u>, 49 F.3d 410, 414 (8th Cir. 1995). Thus, for the reasons just discussed above, Ms. Kemper's waiver of her Miranda rights was voluntary.

In determining whether Ms. Kemper's waiver was knowing and intelligent, the Court need look to, among other things, the straightforward language of the advisement of rights, Ms. Kemper's educational and employment background, Ms. Kemper's multiple statements that she understood her rights, and Ms. Kemper's discussions with Sgt. McFarland, Det. Schunzel, and Det. Webb. The evidence in this regard demonstrates that Ms. Kemper knowingly and intelligently waived her <u>Miranda</u> rights.

**D.  Ms. Kemper was not "in custody" for <u>Miranda</u> purposes until she admitted her criminal acts toward the end of the polygraph post-test interview.**

Equally dispositive of some of Ms. Kemper's claims is the fact that she was not "in custody" for a large portion of the time she was interviewed by the detectives.  The procedural safeguards prescribed by <u>Miranda</u> only apply to persons who are in custody.  <u>Oregon v. Mathiason</u>, 429 U.S. 492, 494-95 (1977) (per curiam).  The simple fact that an investigation has focused on a particular suspect does not implicate <u>Miranda</u> if the settings are noncustodial. <u>United States v. Mueller</u>, 2010 WL 502956, *7 (E.D. Mo. Feb 8, 2010) (Noce, J.) (citing <u>Minnesota v. Murphy</u>, 465 U.S. 420, 431 (1984)).  For purposes of this section, the United States will not dispute that Ms. Kemper was being *questioned* within the meaning of the <u>Miranda</u> rule on March 21, 2002 (even though Ms. Kemper was not considered a suspect when Det. Webb and Det. O'Neill first began interviewing her).  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980) (interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect).  Therefore, in examining whether <u>Miranda</u> has application to the time period from when Ms. Kemper was contacted at her home sometime after 10:15 a.m. on March 15, 2002, to the conclusion of the polygraph post-test interview, the Court must examine whether or not the questioning of Ms. Kemper was custodial.

Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of her freedom of action in any significant way.  <u>Miranda</u>, 384 U.S. at 444; <u>Berkemer v. McCarty</u>, 468 U.S. 420, 429 (1984).  In determining whether a suspect is "in custody" at a particular time, the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a "reasonable person in the suspect's position would have understood his situation" to be one of custody are examined.  <u>Berkemer</u>, 468 U.S. at 442; <u>United States v. Carter</u>, 884 F.2d 368, 370 (8th Cir. 1989).  If Ms. Kemper believed her freedom of action had been curtailed to a "degree associated with formal arrest," and that belief

was reasonable from an objective viewpoint, then Ms. Kemper was being held in custody during questioning.  California v. Beheler, 463 U.S. 1121, 1125 (1983); Berkemer, 468 U.S. at 440.

The determination of custody arises from an examination of the totality of the circumstances.  See United States v. Griffin, 922 F.2d 1343, 1347-52 (8th Cir. 1990); see also Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)).  Several common indicia of custody have been identified over time which relates to police practices employed during questioning.  Griffin, 922 F.2d at 1349; Lanier, 838 F.2d at 284; United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Leviston v. Black, 843 F.2d 302, 304 (8th Cir. 1988).  Application of these factors indicates that Ms. Kemper was not in custody for the time period before and during the polygraph examination.

### 1.     Advice given by officers.

As to the first factor, Ms. Kemper was not "deprived of...freedom of action."  Miranda, 384 U.S. at 444.  She, along with Steven Kemper and Jay Long, were asked if they would travel to the Office of Criminal Investigation.  Ms. Kemper agreed even though she was free to decline.  She was allowed to change clothes.  She was not handcuffed.  She was not placed under arrest.  Ms. Kemper rode in the front passenger seat next to Det. Webb as they drove to the office.

Once at the office, nothing had changed.  Ms. Kemper was not handcuffed or arrested.  She was free to leave at any time.  As Det. Webb testified, the investigation was not focused on Ms. Kemper, and the police did not believe Ms. Kemper was involved.  During that interview, it was Ms. Kemper who requested a polygraph examination -- not the detectives.  The detectives allowed Ms. Kemper to take the exam and contacted Ms. Kemper's employer -- again, at Ms. Kemper's request -- to ensure that Ms. Kemper's employer knew she would not be present at work.

At the outset of the polygraph examination, Ms. Kemper again was told that she was free to stop and leave at any time.  At the end of the post-test interview, Ms. Kemper confirmed that she remained of her own free will after being advised that she could leave at any time.

Where an arrest has not been made and a suspect may terminate an interview at any time, custody is frequently found to not exist. <u>Davis v. Allsbrooks</u>, 778 F.2d 168, 171 (4th Cir, 1985) (citing <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)) (finding of custody mitigated where suspect was informed he was not under arrest and was free to leave); <u>Helmel</u>, 769 F.2d at 1306 (significant to finding of lack of custody that [the suspect] was specifically informed that he was not under arrest); <u>United States v. Goudreau</u>, 854 F.2d 1097, 1097 (8th Cir. 1988) (finding of custody mitigated where agents explained that the interview was voluntary and suspect was not placed under arrest); <u>United States v. Hocking</u>, 860 F.2d 769, 773 (7th Cir. 1988) (finding of custody mitigated where suspect aware he is not compelled to answer questions); <u>Leviston</u>, 843 F.2d at 304 (no custody where suspect was aware he was free to leave upon his own request)). The information provided to Ms. Kemper by law enforcement officials made it clear to Ms. Kemper that she was not in custody.

## 2. <u>Lack of restraint</u>.

Ms. Kemper was not restrained during the interview with Det. Webb and Det. O'Neill. She also was not restrained during the polygraph examination other than the mechanisms that were a required part of the examination that Ms. Kemper requested. She was never handcuffed. She was repeatedly asked if she needed anything (soda and cigarettes were provided). Ms. Kemper was allowed to use the restroom. To the extent Ms. Kemper requested anything, it was provided to her, and she was never restrained. <u>See</u> <u>United States v. Dockery</u>, 736 F.2d 1232, 1234 (8th Cir. 1984) (no custody where suspect not physically restrained during interview); <u>United States v. Rorex</u>, 737 F.2d 753, 757 (8th Cir. 1984) (no custody where no attempt to restrict suspect's freedom of action); <u>Hocking</u>, 860 F.2d at 773 (no custody where no restraints were placed on the suspect's movements during the course of questioning). This second factor is a straightforward indicator that Ms. Kemper was not in custody.

### 3.     <u>**Who initiated contact.**</u>

Although it was law enforcement officers who initiated the contact with Ms. Kemper at her home on March 21, 2002, it was Ms. Kemper who voluntarily invited the officers inside her home, and it was Ms. Kemper who voluntarily agreed to go to the police office with Det. Webb. These types of voluntary acts by Ms. Kemper are indicative of custody lacking.  <u>See</u> <u>Dockey</u>, 736 F.2d at 1234 (no custody where suspect initiated the interview); <u>Beckwith v. United States</u>, 425 U.S. 341, 342 (1976) (no custody where suspect invited agents into house); <u>Davis</u>, 778 F.2d at 170 (no custody where suspect voluntarily came to stationhouse for questioning after officers left message at his home requesting a visit); <u>Leviston</u>, 843 F.2d at 304 (no custody where suspect was voluntarily speaking with investigators).  This third factor suggests that Ms. Kemper was not in custody.

### 4.     <u>**Tactics used.**</u>

As already discussed, there is no evidence that any "strong arm" tactics were employed by Det. Webb, Det. O'Neill, Sgt. McFarland, or Det. Schunzel during this relevant time period. The absence of these types of tactics is a factor which can assist a court in reaching the objective conclusion that Ms. Kemper could not have associated the questioning with formal arrest.  <u>See</u> <u>Jones</u>, 630 F.2d at 616; <u>Dockery</u>, 736 F.2d at 1234.  This fourth factor is further evidence that Ms. Kemper was not in custody.

### 5.     <u>**Domination of interview.**</u>

An interrogation which occurs in an atmosphere dominated by the police is more likely to be viewed as custodial rather than one which does not.  <u>Berkemer</u>, 468 U.S. at 438.  Because Ms. Kemper was brought to an interview room inside an office and questioned by one or more police detectives, this factor -- taken in isolation -- slightly decreases the probability that an objective, reasonable person would feel that they were not in custody during the questioning.  Of course, this is but one factor to be considered in light of all the others.  It is not necessary to a finding that Ms. Kemper was not in custody that all indicia be presented by the factual

circumstances of the case.  <u>United States v. Longbehm</u>, 850 F.2d 450, 452-53 (8th Cir. 1988).  A particularly strong showing with respect to one or more factors may compensate for a deficiency with respect to another factor.  <u>South Dakota v. Long</u>, 465 F.2d 65, 70 (8th Cir. 1972).

*       *       *

Application of each factor, taken together, to the factual record before this Court, demonstrates that Ms. Kemper was not in custody when first contacted at her home sometime after 10:15 a.m. on March 15, 2002, up through the conclusion of the polygraph post-test interview.  No <u>Miranda</u> warnings were required during that time period because Ms. Kemper was not in custody.  (Of course, those warnings were provided to her as previously discussed).  Accordingly, a separate but equally dispositive ground exists upon which this Court can deny a substantial portion of Ms. Kemper's suppression motion.

<u>CONCLUSION</u>

For the foregoing reasons, the United States of America respectfully requests that this Court deny defendant Sandra Kay Bryant's motion to suppress in its entirety.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

/s/ Thomas Rea
THOMAS E. DITTMEIER
THOMAS REA
SAYLER A. FLEMING
Assistant United States Attorneys
111 South Tenth Street, 20th Floor
Saint Louis, Missouri  63102
Telephone: (314) 539-2200
Facsimile: (314) 539-3887

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and accurate copy of this document was filed with the Court's electronic file management system for service upon all parties and counsel of record on this 23rd day of January, 2012.

/s/ Thomas Rea
THOMAS REA, AUSA