UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
         v.                         )    No.  4:11CR447 AGF
                                    )                  (FRB)
SANDRA KAY BRYANT,                  )
                                    )
                Defendant.          )


**MEMORANDUM,**
**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**


Presently pending before the court is defendant Sandra
Kay Bryant's Motion To Suppress Statements (Docket No. 44). All
pretrial motions in the above cause were referred to the
undersigned United States Magistrate Judge pursuant to 28 U.S.C. §
636(b).

By stipulation of the parties this matter was taken up,
considered and decided upon the written Appendix and Joint
Supplemental Appendix submitted by the parties, without any oral or
live testimony from any witnesses. (See Docket No. 61)
(Stipulation) and Docket Nos. 55 and 57 (Appendix and Joint
Supplemental Appendix). In making the following findings of fact
the undersigned has reviewed all of the evidence submitted in the
Appendix and Joint Supplemental Appendix.

## Findings Of Fact

On November 16, 2001, a fire occurred at a residence located at 6682 Champana Lane, in St. Louis County, Missouri. At the time of the fire the residence was occupied by Sandra Kay (Bryant) Kemper, her husband Steven Kemper, and their teenaged son Zachariah Kemper. Also living in the residence were Sandra Kemper's elderly mother Betty J. Bryant, and Jay Long, a friend of Steven Kemper. Sandra Kemper, Steven Kemper, Betty Bryant and Jay Long were able to escape from the burning building, but Zachariah Kemper perished in the fire.

Officers of the St. Louis County Police Department responded to the scene of the fire. Among those officers was Detective Melissa Webb of the Bureau of Crimes Against Persons.[1] Upon arrival she viewed the scene and recorded her observations. After conducting her initial investigation Detective Webb located and interviewed the surviving occupants of the residence, including Sandra Kemper. Detective Webb found Sandra Kemper at the residence of a neighbor, across the street from the Kemper residence. Detective Webb interviewed Sandra Kemper as she and Detective Webb sat in the neighbor's residence. Detective Webb asked Sandra Kemper questions about circumstances surrounding the fire and Sandra Kemper answered those questions. Detective Webb also

---

[1]Detective Webb is sometimes referred to in the record as Detective Varga.

interviewed Steven Kemper and Jay Long at the scene on November 16, 2001. She attempted to interview Betty Bryant, but Ms. Bryant was emotionally upset and crying and Detective Webb pursued the matter no further with her.

Following their initial on scene investigation officers of the St. Louis County Police Department continued their investigation of the fire. During that further investigation they learned among other things that fires had earlier occurred at several other residences associated with the Bryant/Kemper family. As part of their continuing investigation they decided to re-interview the Kempers, Jay Long and Betty Bryant.

On the morning of March 21, 2002, Detective Webb and other officers went to a residence at 5 Blossomwood Court in St. Louis County, where the subjects were then living. The officers arrived at the residence between 10:15 a.m. and 10:45 a.m. The officers knocked and Sandra Kemper answered the door. The officers told the subjects that they wished to conduct additional interviews concerning the fire. They asked Sandra Kemper, Steven Kemper and Jay Long if they would go to the police station to be interviews and all three agreed. On account of her advanced age and physical condition an interview of Betty Bryant was conducted at the residence rather than at the police station. Sandra Kemper was driven to the police station by Detective Webb in Detective Webb's police vehicle. Ms. Kemper rode in the front seat and was not

restrained in any way. Detective Webb did not question Ms. Kemper during the drive to the station.

Upon arrival at the police station Ms. Kemper was placed in an interview room. She was not handcuffed or otherwise restrained in any way. Detective Webb, accompanied by Detective Matthew O'Neill, then began to interview Ms. Kemper, asking her questions about the fire at the Champana Lane residence and the information learned about other fires. At some point during the interview Ms. Kemper told the officers that she wanted to take a polygraph examination. The officers continued to question Ms. Kemper and specifically asking if she believed that Steven Kemper might have set the fire at the Champana residence. Ms. Kemper reacted angrily to the question and again stated that she wished to take a polygraph examination. Detectives Webb and O'Neill then ceased their questioning of Ms. Kemper.

Supervisory Detective Michael McFarland had been observing some of the interview of Ms. Kemper outside of the interview room through a closed circuit television monitoring system. When he observed that Ms. Kemper had become upset at the questioning by Detectives Webb and O'Neill, and that she had asked for a polygraph examination Detective McFarland entered the interview room and spoke to Ms. Kemper. She expressed concern about not being at work and it was agreed that Detective McFarland would contact Ms. Kemper's work to inform them that she would not

be there, which he did.  Detective McFarland also provided her a soda as she had requested.

Detective McFarland then explained to Ms. Kemper that before a polygraph examination could be administered it was required that she be advised of her constitutional rights. Detective McFarland did so because he knew that the polygraph examiner would not conduct a polygraph examination unless a subject had first been advised of and waived their constitutional rights. Detective McFarland wanted to determine if Ms. Kemper would be willing to waive her rights before contacting the polygraph examiner and arranging for such examination.

Detective McFarland then presented Ms. Kemper with a written form which set out the following information:

> Before we ask you any questions, you must understand what your rights are:
>
> 1. You do not have to make any statement at this time and have a right to remain silent.
> 2. Anything you say can and will be used against you in a court of law.
> 3. You are entitled to consult with an attorney before an interview and to have an attorney present at the time of the interview.
> 4. If you cannot afford an attorney, one will be appointed for you.

Detective McFarland read the form to Ms. Kemper.  After each of the four enumerated rights was read to Ms. Kemper, Detective McFarland asked her if she understood the right just read.  Ms. Kemper then

placed her initials in a space next to each right indicating that she understood. Detective McFarland then read the paragraph following the advice of rights stating as follows:

> I have read the above statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Detective McFarland asked Ms. Kemper if she agreed with this statement and she said that she did and signed the form. The form is dated March 21, 2002, at 2:20 p.m. (See Exhibit EH-1). Detective McFarland then left the room. He gave the executed Advice and Waiver Of Rights form to Detective Webb. Detective Webb then contacted Officer Kenneth Schunzel to arrange for a polygraph examination of Ms. Kemper.

Officer Schunzel then set up the equipment necessary to administer the polygraph examination. Officer Schunzel then began an interview of Ms. Kemper. He did so by again using a printed Advice And Waiver Of Rights Form. This form was exactly the same in substance as the form earlier used by Detective McFarland. Officer Schunzel asked Ms. Kemper to read each right aloud from the form. After she read each right Ms. Kemper was asked if she understood the right and she said that she did and initialed the form so indicating. Officer Schunzel then had Ms. Kemper read

aloud the paragraph stating that she understood the rights, was willing to answer questions, did not wish to have lawyer present, and that no threats, promises or coercion had been used against her. Officer Schunzel then asked Ms. Kemper if she understood the paragraph that she read, and she stated that she did. Officer Schunzel then asked Ms. Kemper if she was willing to "give up these rights and talk to use about this particular incident?" Ms. Kemper replied "Yes". Officer Schunzel then asked Ms. Kemper to sign the form, which she did. The form is dated March 21, 2002, at 3:00 p.m. (See Exhibit EH-2).

Officer Schunzel then handed a second form, a Polygraph Examination Release form, to Ms. Kemper and asked her to read the first paragraph on the form to herself. That paragraph read as follows:

> I, SANDRA KEMPER , DO HEREBY AGREE VOLUNTARY (sic), WITHOUT DURESS, COERCION, PROMISE OR REWARD, IMMUNITY OR FORCE, TO BE EXAMINED THROUGH THE USE OF A POLYGRAPH INSTRUMENT, WHICH IS A PHYSIOLOGICAL RECORDING DEVICE USED IN THE DETECTION OF DECEPTION. I UNDERSTAND THAT THE OPERATION OF THIS AND OTHER RELATED INSTRUMENTATION INVOLVES THE USE OF ELECTRONIC APPARATUS FOR THE MONITORING AND RECORDING OF PHYSIOLOGICAL AND VOCAL INFORMATION. FURTHER, I WAS ADVISED THAT I COULD NOT BE FORCED OR COERCED INTO SUBMITTING TO THIS INTERVIEW AND/OR POLYGRAPH EXAMINATION AND UNDERSTAND THAT I MAY TERMINATE SAID INTERVIEW AND/OR POLYGRAPH EXAMINATION AT ANY TIME.

After Ms. Kemper read the paragraph the following conversation ensued:

(Questions by Officer Schunzel, Answers by Sandra Kemper)

Q.   Do you understand that?

A.   Yes, I do.

Q.   What that means is, Sandy, you're here of your own free will.

A.   Right.

Q.   If you don't want to take this polygraph test, you don't have to.  Any time you want to get up and leave this room, you say, Mr. Schunzel, I'm sorry, I'm done, I'm finished, I don't want to talk to you any more.  You -- you can do that.

A.   Okay.

Q.   You're here totally of your free -- of your own free will.

A.   Okay.

Q.   You understand that?

A.   Um-hum.

Q.   Do you agree with that?

A.   I agree with that.

Q.   Would you sign on the right hand side of the form, please.

Ms. Kemper then signed the form at the end of the first paragraph (See Exhibit EH-3).

Officer Schunzel then proceeded to conduct a pre-polygraph interview with Ms. Kemper.  The interview was generally

non-accusatory in nature. The pre-polygraph interview lasted approximately one hour and twenty minutes.

Officer Schunzel then began the polygraph examination. He went over with Ms. Kemper the questions that would be asked during the examination. He explained the procedures that would be used during the examination and the manner in which it would be conducted. Officer Schunzel then asked Ms. Kemper to read the second paragraph of the Polygraph Examination Release form which she did. Officer Schunzel then asked Ms. Kemper if she understood and agreed with what was said in the paragraph. Ms. Kemper said that she did and then signed the form. The second paragraph of the form read as follows:

> I ACKNOWLEDGE THAT I HAVE EARLIER BEEN ADVISED OF MY CONSTITUTIONAL RIGHTS AS OUTLINED IN THE MIRANDA DECISION AND, AS I DID EARLIER, AGAIN KNOWINGLY AND VOLUNTARILY WAIVE MY RIGHTS. I HAVE HAD THE NATURE OF THE INSTRUMENT, EXAMINATION AND QUESTIONS EXPLAINED TO ME, AND FURTHER AGREE TO THE PLACEMENT OF THE NECESSARY ATTACHMENTS TO MY PERSON.
>
> I FURTHER AGREE TO RELEASE AND FOREVER HOLD BLAMELESS THE ST. LOUIS COUNTY DEPARTMENT OF POLICE AND POLYGRAPH EXAMINER, KEN SCHUNZEL, FROM ANY LIABILITY, EITHER FROM THE OPERATION OF THE INSTRUMENTATION OR USE OF THE RESULTS OBTAINED THEREFROM. I FURTHER AGREE THAT THE RESULTS OF THIS EXAMINATION MAY BE RELEASED AND MADE AVAILABLE TO THE DESIGNATED PROPER AUTHORITY, DET. WEBB - C.A.P. .

(See Exhibit EH-3).

Officer Schunzel then conducted the test which consisted of asking the defendant a number of predetermined questions, some of which related to the November 16, 2001, fire on Champana Lane and others which did not. The test was administered three times with each test lasting approximately five minutes.

After the polygraph examination was concluded Officer Schunzel initiated a post-examination interview with Ms. Kemper. He began by telling Ms. Kemper that the results of the polygraph examination indicated that she was not telling the truth, was lying, about whether she started the fire at the Champana Lane address. Officer Schunzel began using various interrogation techniques in order to elicit a confession from Ms. Kemper, including telling her that he wanted to help her, that he thought she was a good person but had done some bad things, that he was sure she never intended for her son to be hurt in the fire, that she was not the same as a mass murderess or a born killer, that this matter was not going to go away, that if she didn't tell the truth she would "bring down the wrath of God" on herself, that if she took the wrong road she would end up in jail with a high bond but that if she took the right road she had options, that he would not be able to help her if she did not tell the truth, that he believed she set the fire in order to collect insurance money, and that with the evidence that was against her she would lose if she chose to go to trial. The post-examination questioning went on for

about forty minutes.  Through all of this Ms. Kemper continued to insist that she did not set the fire.  The following exchange then occurred:

(Questions by Officer Schunzel, Answers by Sandra Kemper).

Q.    Do you want to be perceived as a cold-blooded murderer?

A.    No.

Q.    That's how those people perceive you right now.  I don't think you are.  They perceive you as a cold-blooded murderer that killed your son.  That's how they'll perceive you over in court.  We're almost there.  Do you know what you get for murder?  Do you want that?

A.    No.

Q.    Okay.  I don't think you're a cold-blooded murderer.  I'm sorry you're involved.

Don't let that happen.  You need to talk to me right now.  You know you do.  Yes, you do.

You know you do.  Uncross your legs.  Look at me.  You know you do.  You do.  Right here.  You're afraid right here.

Tell me about the fire.  It's hard.  Tell me about the fire.  How did you set the fire?  How did you set the fire?

Sandy, look at me.  How did you set the fire?

A.    A can of hairspray.

Q.   What did you spray it on?

A.   The trash can.

Q.   In the trash can?

A.   In the trash can.

Q.   What did you ignite it with?

A.   A match.

Q.   Why?

A.   To get out of debt.

Officer Schunzel then went on to ask additional questions about he fire and the occurrences on November 16, 2001. The interview went on for approximately an additional twenty minutes. At the end of the interview Officer Schunzel told Ms. Kemper that she needed to speak with Detective Webb, to tell her the truth and cooperate with her. Ms. Kemper said she was willing to do so. Detective Schunzel then asked Ms. Kemper to read the last paragraph on the Polygraph Examination Release Form which she did. Officer Schunzel asked Ms. Kemper if she agreed with the statement made in the paragraph. Ms. Kemper said that she did and signed under that paragraph which stated as follows:

> WITH THE PRE-TEST INTERVIEW, EXAMINATION AND POST-TEST INTERVIEW NOW BEING OVER, I CERTIFY THAT I UNDERWENT ALL PROCEDURES VOLUNTARILY. WAS WELL TREATED AND REMAINED OF MY OWN FREE WILL AFTER HAVING BEEN ADVISED I COULD LEAVE AT ANYTIME.

(See Exhibit EH-3).

The entire pre-test interview, polygraph examination and post-test interview were audio and video recorded. (See Exhibit EH-4A).

Officer Schunzel told Detective Webb that Ms. Kemper had failed the polygraph examination and that she subsequently admitted setting the fire. Detective Webb then took custody of Ms. Kemper and conducted a further interview of her. Detective O'Neill was also present. At the beginning of the interview Detective Webb orally advised Ms. Kemper that she had the right to remain silent, that anything she said could be used against her in a court of law, that she had the right to have an attorney present before any interview or interrogation, and that if she could not afford an attorney one would be appointed for her through the court system. During the interview Ms. Kemper asked that Detective O'Neill leave the room which he did. At some point, arson investigator Detective Raines came into the room and asked Ms. Kemper some questions. Detective Webb then asked Ms. Kemper if she would be willing to make an audio-recorded statement and Ms. Kemper said that she would.

The audio tape recorded interview began at 8:37 p.m. and ended at 8:50 p.m. At the beginning of the interview Detective Webb reminded Ms. Kemper that she had previously been advised of and waived her rights. She asked Ms. Kemper if she understood those rights and Ms. Kemper said that she did. Detective Webb then

asked if Ms. Kemper was willing to continue with the interview and Ms. Kemper said that she was.  In response to questioning by Detective Webb Ms. Kemper said that she had started the fire at the Champana Lane residence and did so in order to collect insurance proceeds to be used to get out of debt.  She provided details as to how she set the fire and what had occurred thereafter.  (<u>See</u> Exhibit EH-5B).

After completing the audio recorded interview of Ms. Kemper Detective Webb transferred custody of Ms. Kemper to Detective John Newsham so that he could book and process Ms. Kemper for the offenses with which she was being charged.  Detective Newsham had witnessed some of the interviews of Ms. Kemper on a closed circuit television monitor.  He was also aware that Ms. Kemper had previously been advised of her <u>Miranda</u> rights. Detective Newsham obtained booking information and completed the booking process in about five minutes.  He then asked Ms Kemper if he could ask her some additional questions about the fire and death of her son.  He then spoke with Ms. Kemper for about fifteen minutes.  He then contacted Detective McFarland and told him that Ms. Kemper wished to make additional statements.

Detective Webb and Detective Newsham then again interviewed Ms. Kemper. The interview began at 9:48 p.m. and ended at 9:56 p.m.  The interview was audio recorded.  At the beginning of the interview Detective Newsham verified with Ms. Kemper that

she had previously been advised of her rights. Ms. Kemper then told the officers that she set the fire with the intent of "getting rid of everybody", meaning her husband, son, mother and her husband's friend, all of the other occupants of the residence.

At no time prior to or while being questioned on March 21, 2002, did Ms. Kemper ever state that she did not wish to answer questions or that she wished to speak with a lawyer before answering questions, nor did she ever ask that questioning cease once it had begun.

Ms. Kemper was allowed to use the restroom, and at her request was provided soda and cigarettes. She was offered food but did not take any.

## **Discussion**

In her motion the defendant states that she "moves this court to suppress all inculpatory statements, oral, written or otherwise recorded which were obtained on March 21, 2002 during a polygraph pre-test, examination and post-test interrogation by Detective Schunzel and two (2) subsequent interrogations by Detective Webb (Varga) and Newsham, Detective Raines and Detective O'Neill conducted at the St. Louis County Police station." As grounds to suppress these statements the defendant asserts that she was in custody at the time the statements were made, that she was not advised of her Miranda rights, that she did not voluntarily waive her Miranda rights and that her statements were not voluntary

in that they were the result of coercion, pressure, intimidation and deception.

The defendant claims that she was "in custody" at the time of her statements to Officer Schunzel, and at all times thereafter, and that therefore any questioning was unlawful because not proceeded by <u>Miranda</u> warnings.  In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) the Supreme Court held that before questioning a person in custody law enforcement officials must advise the person that she has the right to remain silent; that any statements she makes may be used against her at trial; that she has the right to have an attorney present during questioning; and that if she cannot afford an attorney one will be appointed for her.  <u>Id.</u> at 478-79.  The officials may question the person after so advising her if the person voluntarily, knowingly and intelligently waives these rights and agrees to answer questions put to her by the officials.  Absent such advice and waiver, statements obtained through interrogation of a person in custody are not admissible against the person at trial.  <u>Id.</u> at 479.

The proscriptions of <u>Miranda</u> apply only when the person questioned is "in custody."  <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990).  A person is in custody within the meaning of <u>Miranda</u> when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" <u>Berkemer v. McCarthy</u>, 468 U.S. 420, 440 (1984); <u>California v.</u>

<u>Beheler</u>, 436 U.S. 1121, 1125 (1983).   In determining whether a person was in custody at the time of questioning the court must examine the objective circumstances surrounding the interrogation, <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994), and to determine from those circumstances "how a reasonable (person) in the suspect's position would have understood his situation." <u>Berkemer v. McCarthy</u>, 468 U.S. at 442.  <u>Miranda</u> does not apply if the person is not in custody, even if the person is suspected of criminal activity or is a focus of the investigation.  <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977); <u>Beckwith v. United States</u>, 425 U.S. 341, 345 (1976).   "Interrogation" within the meaning of <u>Miranda</u> is "express questioning or its functional equivalent." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).  The "functional equivalent" of interrogation are "words or actions on the part of [law enforcement officers] . . . that the [law enforcement officers] should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 301.

   In <u>United States v. Griffin</u>, 922 F.2d 1343, 1349 (8th Cir. 1990), the Eighth Circuit Court of Appeals identified a number of factors which the court has looked to in determining whether a person is in custody within the meaning of <u>Miranda</u>.  Those factors are as follows:  (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the

suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; and, (6) whether the suspect was placed under arrest at the termination of the questioning.  Id.

Applying these standards the undersigned concludes that Ms. Kemper was not in custody within the meaning of Miranda when first interviewed by Detectives Webb and O'Neill at the police station on March 21, 2002.[2]  Ms. Kemper was asked to, and agreed, to accompany Detective Webb to the police station and to submit to an interview.  The mere fact that the interview was conducted at the police station does not render the questioning "custodial". Oregon v. Mathiason, 429 U.S. 492, 495 (1977); California v. Beheler, 463 U.S. 1121, 1123 (1983); United States v. LeBrun, 363 F.3d 715, 720-721 (8th Cir. 2004), cert denied, 543 U.S. 1145 (2005); United States v. Cota, 953 F.2d 753, 758-59 (2nd Cir. 1992) (Miranda warnings not required when defendant voluntarily

---

[2]The undersigned notes that in her motion the defendant does not seek suppression of any statements made to Detectives Webb and O'Neill during their initial, pre-polygraph examination, interview of the defendant.  The matter is addressed herein solely as it relates to the issue of if and when the defendant became "in custody" within the meaning of Miranda.

accompanied officers to police station and answered questions). Ms. Kemper was not handcuffed or otherwise physically restrained during the questioning. No firearms were displayed at any time to Ms. Kemper. Ms. Kemper was not placed under arrest during the first interview by Detectives Webb and O'Neill. Indeed, the questioning was concluded by Detectives Webb and O'Neill when Ms. Kemper herself asked to submit to a polygraph examination. The initial interview of the defendant was non-custodial.

Prior to the polygraph examination Detective McFarland fully and completely advised Ms. Kemper of her <u>Miranda</u> rights. She stated that she understood the rights and signed a form so stating, and agreed to waive those rights and to answer further questions. She also acknowledged that she had not been threatened, pressured or coerced into doing so.

At the beginning of the pre-polygraph interview Officer Schunzel again advised Ms. Kemper of her <u>Miranda</u> rights. Once again she stated that she understood her rights and signed a form so stating. She also again acknowledged that no threats, pressure or coercion had been used against her and again agreed to give up those rights and to answer questions.

Also at the beginning of the pre-polygraph interview Officer Schunzel presented a form to Mrs. Kemper, which she read and signed, which stated that she was submitting to the interview and polygraph examination voluntarily and of her own free will,

without coercion and knowing that she could terminate the interview at any time. She also signed the form again acknowledging that she had been advised of her <u>Miranda</u> rights, and that she was voluntarily waiving those rights. Officer Schunzel was not required to readvise the defendant of her <u>Miranda</u> rights after completion of the polygraph examination and the beginning of his post-polygraph interview. <u>Wyrick v. Fields</u>, 459 U.S. 42 (1982).

Thus, assuming for purposes of this discussion that the defendant was "in custody" within the meaning of <u>Miranda</u> at the time of the pre-polygraph interview by Officer Schunzel and at all times thereafter, the defendant's contention in her motion that she was not advised of her right to remain silent, or of her right to consult with a lawyer or to have a lawyer present during interview, or of her right to the appointment of counsel if she could not afford one is directly refuted by the evidence before the court.

Further, at the beginning of the second, post-polygraph interview of the defendant Detective Webb advised the defendant orally of her <u>Miranda</u> rights. At the beginning of the audio recording Ms. Kemper was reminded by Detective Webb that she had been advised of her constitutional rights and the defendant confirmed that she had been so advised, understood her rights and wished to continue with the interview. Then at the beginning of the third and last interview of the defendant by Detectives Webb and Newsham Detective Webb again confirmed that the defendant had

previously been advised of her rights. "There is no requirement that an accused be continually reminded of his rights once he has intelligently waived them." <u>United States v. Andaverde</u>, 64 F.3d 1305, 1312 (9th Cir. 1995), quoting <u>United States v. Anthony</u>, 474 F.2d 770, 773 (5th Cir. 1973); <u>United States v. Frankson</u>, 83 F.3d 79, 83 (4th Cir. 1996). Further, at the beginning of each interview Detective Webb confirmed that the defendant had been advised of her rights and waived them. In these circumstances the second and third statements to Detective Webb are admissible. <u>United States v. Ferrer-Montoya</u>, 483 F.3d 565, 569 (8th Cir. 2007). Further, it is of no consequence that the second and third interviews were conducted by Detective Webb after other officers had advised the defendant of her rights. A change in interrogators is not determinative of the validity of a waiver of <u>Miranda</u> rights. <u>United States v. Black Bear</u>, 422 F.3d 658, 665 (8th Cir. 2006); <u>United States v. Andaverde</u>, 64 F.3d 1305, 1312-13 (9th Cir. 1995).

The defendant also claims in her motion that she did not waive her <u>Miranda</u> rights. Again, this assertion is refuted by the evidence before the court. The defendant was twice advised of her <u>Miranda</u> rights and acknowledged, in writing, on both occasions that she had been advised of those rights, that she understood them, and that she was willing to waive those rights and to answer questions. Such express waivers are strong proof of the validity of the waiver of rights. <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979).

In the argument portion of her brief the defendant seems to argue that the interrogation procedures used here violated the Supreme Court's holding in <u>Missouri v. Siebert</u>, 542 U.S. 600 (2004). In that case the Court condemned the practice whereby police officers would first obtain a confession from a suspect without the benefit of <u>Miranda</u> warnings, then once the confession was obtained, administer the <u>Miranda</u> warnings and obtain a second confession. In such circumstances, the second confession is not admissible if the evidence shows that the officers use of this "two step" approach was designed, deliberate, intentional or calculated to circumvent <u>Miranda</u>. <u>United States v. Black Bear</u>, 422 F.3d 658, 664 (8th Cir. 2005). The holding in <u>Siebert</u> is not applicable here. While it is true that Detective Webb did not advise Ms. Kemper of her <u>Miranda</u> rights during the initial interview, she did not do so because Ms. Kemper was not at that time suspected of setting the fire and the investigation had not focused on her. Further, it does not appear that Ms. Kemper confessed to the crime during the initial questioning by Detective Webb. Therefore, the holding in Siebert is not applicable here.

As further grounds to suppress her statements the defendant contends in her motion that the statements were not voluntary and were the result of deception, intimidation and coercion.

In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, promises (express or implied), such that the defendant's will was overborne and his capacity for self-determination was critically impaired. Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (citing Culombe v. Connecticut, 367 U.S. 568, 602 (1961)). This determination must be made by looking at the totality of the circumstances, including the conduct of the law enforcement officials and characteristics of the accused. United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004). The government must prove by a preponderance of the evidence that the challenged statements were voluntary. Id. "Obviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." United States v. Astello, 241 F.3d 965, 967 (8th Cir.), cert. denied, 533 U.S. 962 (2001). However, there must be some showing that the officers engaged in some coercive conduct to overbear the will of the defendant. Id. "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'". Colorado v. Connelly, 479 U.S. 157, 167 (1986).

Quite significant in determining whether the defendant's statements were voluntary is the fact that the defendant was twice advised of her Miranda rights, expressly waived those rights and agreed to answer questions. Further she acknowledged in writing,

both before and after her interview with Officer Schunzel that she was not threatened, pressured or coerced into waiving her rights or to make any statements. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictate of <u>Miranda</u> are rare." <u>Berkemer v. McCarthy</u>, 468 U.S. 420, 433 (1984).

"[O]fficers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation caused the defendant's will to be overborne." <u>United States v. Brave Heart</u>, 397 F.3d 1035, 1041 (8th Cir. 2005) (Internal citations and quotes omitted). Officer Schunzel employed some of these interrogation stratagems in conducting his interview of Ms. Kemper, however after reviewing the complete interrogation the undersigned concludes that the defendant's will was not overborne by such conduct.[3]

The questioning of Ms. Kemper was not particularly lengthy. Although the record does not reflect the length of the

_____

[3]The undersigned has listened to and viewed in its entirety the three hour audio/video recorded interview of Ms. Kemper by Officer Schunzel.

-24-

first interview of Ms. Kemper by Detectives Webb and O'Neill it appears that the interview may have lasted between two and three hours. The interview by Officer Schunzel began shortly thereafter and lasted a total of three hours. The pre-polygraph interview by Officer Schunzel lasted approximately one and one-half hours. The polygraph examination which followed lasted approximately one half hour. The post-polygraph interview was then begun by Officer Schunzel. After about forty minutes Ms. Kemper made her first incriminating statements regarding the fire. The interview continued for about twenty minutes. Thereafter Ms. Kemper was again interviewed by Detective Webb. The audio recorded interview lasted about thirteen minutes. Ms. Kemper then spoke for about fifteen minutes with Detective Newsham following the booking process. She was then again interviewed by Detective Webb and Newsham. The audio recorded interview lasted about eight minutes. The initial interrogation of Ms. Kemper began at about 12:00 p.m. and the last interview was concluded at about 10:00 p.m. The length of these interviews was not so great as to overcome the will of Ms. Kemper to resist efforts to obtain a confession. See United States v. Dehghani, 550 F.3d 716, 721 (8th Cir. 2001)(Five and one half hour interrogation did not render confession involuntary); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (Six or seven hour period of interrogation not coercive); U.S. v. Petary, 857 F.2d 458, 461 (8th Cir. 1988)(same); William v. Norris, 576 F.3d

850, 868-69 (8th Cir. 2009) (Thirteen hour interrogation not unconstitutional).

As to the characteristics of the defendant the evidence shows that at the time of the interviews on March 21, 2002, Ms. Kemper was 45 years of age. She is a high school graduate. She was employed as a certified nurses assistant and had held similar positions in the health care field in the past. In viewing her demeanor during the audio/video recorded interview with Officer Schunzel she appeared to be of a least average intelligence.

The defendant asserts in her motion that at the time of her interrogation by the officers she was "still grieving as a mother who had lost her son, suffering from depression and sleep deprived after having worked all night at her job as a C.P.N." During the interview with Officer Schunzel Ms. Kemper said that she was being treated for depression, took medication daily as part of the treatment and had not had medication that day. Although Ms. Kemper was being treated for depression and grieving for her lost son she did not appear to be overly emotional during her interview with Officer Schunzel. She spoke matter of factly about her son without showing signs of emotion. At only one brief moment during the interview did she appear to cry. At the very beginning of the interview Ms. Kemper told Officer Schunzel that she was "tired." She did not further elaborate. Sleeplessness and fatigue do not automatically render a confession involuntary. <u>United States v.</u>

Gaddy, 532 F.3d 783, 788 (8th Cir. 2008). During the interview she appeared alert and responsive. Her speech was coherent. Her answers to questions were direct, responsive and rational.

Considering the totality of these circumstances, including the conduct of the police officers and the characteristics of the defendant, the undersigned concludes that all of the defendant's statements were voluntary.

In summary, it is the finding of the undersigned that the defendant was properly advised of her Miranda rights when in custody and before making any incriminating statements, that she knowingly, voluntarily and intelligently waived those rights and that all of her statements were voluntary and were not the product of any coercive conduct by any police officers such that the defendant's will was overborne.

## Conclusion

For all of the foregoing reasons, the defendant's Motion To Suppress Statements (Docket No. 44) should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion To Suppress Statements (Docket No. 44) be denied.

The parties are advised that they have until **December 11, 2013,** in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in

waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


_____

UNITED STATES MAGISTRATE JUDGE


Dated this 27th day of November, 2013.